**Gerald HAMMOCK, Appellant–Defendant,**

v.

**RED GOLD, INC. and Liberty Mutual Group, As Subrogee of Red Gold, Inc., Appellees–Plaintiffs.**

No. 48A02–0201–CV–46.

Court of Appeals of Indiana.

Feb. 28, 2003.

Donald K. McClellan, McClellan, McClellan & Arnold, Muncie, IN, Attorney for Appellant.

Carolyn Small Grant, Grant & Grant, Indianapolis, IN, Attorney for Appellee Liberty Mutual Group.

Craig R. Patterson, Matthew J. Elliott, Beckman Lawson, LLP, Fort Wayne, IN, Attorneys for Appellee Red Gold, Inc.

## OPINION

SULLIVAN, Judge.

On August 31, 1998, Gerald Hammock was involved in an automobile accident in Alexandria, Indiana. Hammock's car struck an electric utility pole owned by American Electric Power, which caused the power at a Red Gold plant ("Plant"), located approximately 2 miles from Alexandria,[1] to go out for nearly five hours.[2] As a result of the power outage, Red Gold's operations ceased, resulting in a loss of tomatoes in various stages of processing, loss of ingredients added to the tomatoes, loss of finished product, extra labor costs, additional cleaning costs, and loss of profits. Red Gold submitted an insurance claim to Liberty Mutual Group ("Liberty"),[3] which paid a total of

---

1. Hammock asserts in his brief that the Plant is approximately 2½ miles from the accident scene. An investigation report which was submitted by Hammock to the court states that the Plant is two miles from the substation and that the accident occurred at a location approximately ½ mile from the substation.

2. The power did not go out until approximately 2½ hours after the pole was struck. An expert retained by Hammock requested comment from American Electric Power as to

why there was such a delay from the time of the accident to the time of the power outage. We have found no response from American Electric Power as to the cause of the delay.

3. Liberty is the subrogee of Red Gold, Inc., who is also involved in this litigation. However, the summary judgment motion ruled upon by the trial court only involved the financial claim for damages which Liberty was required to reimburse Red Gold according to its insurance contract with Red Gold.

$44,212.00 to Red Gold. However, this payment by Liberty did not cover the entire loss incurred by Red Gold as a result of the power outage.

Red Gold filed a complaint for damages against Hammock asserting that he was negligent in the operation of his vehicle, and as a result, Red Gold suffered substantial losses. In his answer, Hammock denied that he was negligent and asserted as affirmative defenses that Red Gold was either wholly or partially at fault ("comparative fault"), that it incurred the risks of its actions, and that the damages were caused in whole or in part by the acts of non-parties Ralph Sayre and American Electric Power. Following Hammock's answer to Red Gold's complaint, Liberty moved to join as a party plaintiff. After that motion was granted, Liberty then filed a complaint against Hammock asserting the rights of Red Gold. Hammock answered the complaint by asserting the affirmative defenses of comparative fault and incurred risk on the part of Red Gold.[4]

Liberty filed a motion for summary judgment, which Hammock challenged through his designated evidence by specifically asserting that Red Gold should have had a second power source at the Plant in the event that there was a loss of power. His assertion was based upon the view of his expert, Oliver Max Myers of Wolf Technical Service, who stated that in his professional engineering opinion it would be standard practice for a plant of that size to have had a second source of power. Hammock claimed that this failure on behalf of Red Gold was an issue of comparative fault, which was a question to be decided by the jury. Red Gold subsequently filed a motion to strike Hammock's affirmative defenses asserted as to Red Gold's complaint by stating that it had no duty to anticipate the negligent act of Hammock.[5] Red Gold further noted that the evidence designated by Hammock stated that " 'the second source of power is not required by any codes in the State of Indiana.'" Appendix at 72–73. Based upon this evidence, Red Gold asserted that Hammock conceded that no duty existed upon Red Gold to have a second source of power. The trial court granted Red Gold's motion to strike Hammock's affirmative defenses.

At the summary judgment hearing, Hammock presented the issue whether the damage suffered by Red Gold was foreseeable. He also asserted that a paradox had been created by Red Gold and Liberty's arguments and the trial court's granting Red Gold's motion to strike Hammock's affirmative defenses. Hammock specifically argued that a situation was created in which Liberty relied upon the damage not being foreseeable, thereby negating any duty Red Gold may have had to have a second power source, but that Liberty also argued that the damage was foreseeable for the purpose of establishing the proximate cause element of a negligence claim against Hammock. Following the hearing, the trial court granted Liberty's motion for summary judgment.

Hammock appeals from the grant of summary judgment in favor of Liberty. He presents several issues for our review. However, we find one issue to be disposi-

---

4. Hammock did not assert the affirmative defense of non-party liability in the answer to Liberty's complaint. At oral argument, Hammock's counsel stated that the non-party defense was not being pursued and that American Electric Power was not involved in this litigation in any manner.

5. Red Gold sought to strike the affirmative defenses of comparative fault and incurred risk. No challenge was made to the non-party defense.

tive, whether Hammock owed a duty to Red Gold. It is upon this ground that we reverse the trial court's entry of summary judgment in favor of Liberty.

Summary judgment is appropriate when the designated evidentiary matter reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Spudich v. Northern Indiana Pub. Serv. Co.*, 745 N.E.2d 281, 289 (Ind.Ct.App.2001), *trans. denied.* The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that there is an entitlement to judgment as a matter of law. *Id.* If the moving party meets these requirements, the burden then shifts to the nonmovant to establish genuine issues of material fact for trial. *Id.* at 290.

■■■ We are bound by the same standard as the trial court in considering an appeal from the grant or denial of summary judgment. *Id.* We consider only those facts which were designated to the trial court at the summary judgment stage. *Id.* We do not reweigh the evidence, but rather, liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact. *Id.* Even if the facts are undisputed, summary judgment is inappropriate where the record reveals an incorrect application of the law to the facts. *Id.* Summary judgment is rarely appropriate in negligence cases because issues of contributory negligence, causation, and reasonable care are more appropriately left for determination by the trier of fact. *Ousley v. Board of Comm'rs of Fulton County*, 734 N.E.2d 290, 293 (Ind. Ct.App.2000), *trans. denied.*

■■ To recover under a theory of negligence, a party must establish: (1) a duty on the part of the defendant owed to the plaintiff; (2) a breach of that duty; and (3) an injury to the plaintiff proximately caused by the breach. *Lawson v. Lafayette Home Hosp., Inc.*, 760 N.E.2d 1126, 1129 (Ind.Ct.App.2002), *trans. denied.*

### Duty

■■ Generally, the existence of a legal duty owed by one party to another in a negligence action is a pure question of law. *P.T. Barnum's Nightclub v. Duhamell*, 766 N.E.2d 729, 737 (Ind.Ct.App.2002), *trans. denied.* However, factual questions may be interwoven, rendering the existence of a duty a mixed question of law and fact to be determined by the fact-finder. *Baxter v. I.S.T.A. Ins. Trust*, 749 N.E.2d 47, 55 (Ind. Ct.App.2001).

Justice Dickson, speaking for our Supreme Court in *Gariup Const. Co., Inc. v. Foster*, 519 N.E.2d 1224, 1227 (Ind.1988), noted that the duty determination is made "not without difficulty," and, in quoting from PROSSER & KEETON ON TORTS § 53 at 359 (5th Ed.1984), concluded that "[n]o better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." It is for this reason, perhaps, that we have in the past articulated the principle that, "The Law imposes but one common law duty and that duty is to use due care." *South Eastern Indiana Natural Gas Co., Inc. v. Ingram*, 617 N.E.2d 943, 953 (Ind.Ct.App. 1993) (citations omitted).

As a corollary to this premise we have said:

"[T]he substantive law establishes the standard of care which must be met, i.e., reasonable care. The standard is a fixed one and is independent of the conduct of others but the conduct required of the individual to measure up to the fixed standard varies depending upon

the nature of the duty owed and the surrounding circumstances." *Walters v. Kellam & Foley,* 172 Ind.App. 207, 231, 360 N.E.2d 199, 214 (1977), *trans. denied.*

In short, the duty is that of reasonable care under the circumstances. That duty never changes. It always exists although the circumstances may differ from case to case.

In 1991, however, our Supreme Court decided *Webb v. Jarvis,* 575 N.E.2d 992 (Ind.1991), setting forth several varying factors to be balanced in determining whether a duty exists. This pronouncement could be read to undercut the principle that there is but one common law duty, that of reasonable care under the circumstances.[6] On the other hand, it might be read to validate the never changing duty of reasonable care but proposing that the enumerated factors should be examined in order to determine the breadth of that duty.

Perhaps a degree of uncertainty in this regard is what led, at least in part, to the criticism of *Webb v. Jarvis* in a lengthy article by Professor Jay Tidmarsh, *Tort Law: The Languages of Duty,* 25 IND. L.REV. 1419 (1992), in which the author observed that despite the *Webb* test, "Indiana does not in fact have a single, coherent theory of duty." He reached this conclusion by analysis of Indiana cases decided during the previous year, which failed to follow the balancing test, or, even more striking, failed to even cite *Webb.* He concluded that at that time, and even post-*Webb,* "Indiana tort law is presently a confused patchwork of obligation and immunity." *Id.*

Be that as it may, in *Webb,* the enumerated factors to be balanced were stated to be: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. 575 N.E.2d at 995. In its discussion of the foreseeability component of duty, the court in *Webb* used certain language and phrasing which appear to be relevant to a discussion of proximate cause. The phrase "reasonable foreseeability of harm to the person injured" is itself suggestive of a proximate cause analysis. But even more to the point, the Court analyzed the duty owed by the physician defendant in the context of the "causal connection" between the medication prescribed and the patient's violent behavior. *Webb,* 575 N.E.2d at 997. "This lack of guidance," at least in part, prompted the court in *Goldsberry v. Grubbs,* 672 N.E.2d 475, 478 (Ind.Ct.App. 1996), *trans. denied,* to differentiate between duty-foreseeability and proximate cause-foreseeability. The concept of foreseeability is germane to the duty owed by any one defendant to any one plaintiff just as it is germane to the requirement that a defendant's negligence be a proximate cause of plaintiff's injury or damage. Foreseeability, therefore, is a component of both aspects of a successful negligence action.

■ The analysis of the element of foreseeability with regard to negligence lawsuits requires the making of subtle distinctions between the application of the concept as to duty and the application as to proximate cause. *Goldsberry,* 672 N.E.2d at 478–79.[7] But see *Bush v.*

---

6. *But see South Eastern Indiana Natural Gas Co., Inc. v. Ingram, supra,* decided two years after *Webb v. Jarvis.*

7. In stating that the duty to exercise reasonable care is that which is owed "under the

circumstances," the *Webb* decision tended to inject the matter of foreseeability. But in so stating, the danger was to blur the foreseeability component of duty with the foresee-

*Northern Indiana Pub. Serv. Co.*, 685 N.E.2d 174 (Ind.Ct.App.1997), *trans. denied*, in which the majority sought to apply the three-pronged *Webb* test, but did not distinguish between duty and proximate cause as to foreseeability.

■■■■ Hammock asserts that the trial court erred in granting summary judgment because the harm to Red Gold was not reasonably foreseeable. In doing so, however, he does not delineate between duty-foreseeability and proximate cause-foreseeability. This failure is clearly understandable in light of the fact that the Indiana appellate courts have also failed to do so. With *Goldsberry* the line of demarcation was drawn. That case held that foreseeability for the purposes of duty involves a general and broad analysis of the plaintiff and the harm involved without regard to the facts of the occurrence. 672 N.E.2d at 479.[8]

As stated above, Hammock's counsel argued that a paradox had been created in which, on one hand, Liberty argued that the harm was not foreseeable with respect to establishing a duty on behalf of Red Gold to have a second power source, but on the other hand, the outcome was foreseeable in order to show that the harm was proximately caused by Hammock. A review of the transcript and the briefs reveal that some confusion exists between the parties as to how foreseeability should be analyzed in this case. In his brief, Hammock relies upon authority which discusses the issue of foreseeability as a component of proximate cause. However, intermingled in those citations to authority, Hammock also relies upon cases which discuss foreseeability as a component of duty.

The transcript of the summary judgment hearing, makes clear that the parties' discussion of foreseeability included the issue of whether Red Gold was a reasonably foreseeable victim who was injured by a reasonably foreseeable harm. Because the parties' arguments and designated evidence included foreseeability as a component of duty, we will address it in that context.[9]

---

ability component of proximate cause. *Goldsberry*, 672 N.E.2d at 478–79.

8. This analysis is to be distinguished from the foreseeability analysis for the purpose of establishing proximate cause. In the context of proximate cause, foreseeability involves evaluating the particular circumstances after the incident occurs. *Goldsberry*, 672 N.E.2d at 479. A negligent act or omission is the proximate cause of an injury if the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated. *Id.* "Thus, when determining proximate cause, foreseeability is determined based on hindsight, and accounts for the circumstances that actually occurred." *Id.* Foreseeability as a component of duty requires a lesser inquiry. *Id. See also Straley v. Kimberly*, 687 N.E.2d 360 (Ind.Ct.App.1997), *trans. denied*.

9. Liberty asserts that Hammock did not designate to the trial court the issue of foreseeability in his designated materials or a brief, and therefore, he was foreclosed from arguing issues of law regarding foreseeability at the summary judgment hearing. In its brief, Liberty cites to several cases which stand for the proposition that an opposing party must designate to the court evidentiary materials and material issues of fact within the thirty-day limit established by Indiana Trial Rule 56, following service of the motion. *See Seufert v. RWB Medical Income Properties I Ltd. Partnership*, 649 N.E.2d 1070 (Ind.Ct.App.1995); *Cloverleaf Apartments, Inc. v. Town of Eaton*, 641 N.E.2d 665 (Ind.Ct.App.1994); *Nelson v. Denkins*, 598 N.E.2d 558 (Ind.Ct.App.1992). *But see Pierce v. Bank One–Franklin, NA*, 618 N.E.2d 16, 19 (Ind.Ct.App.1993) (stating that a brief or memorandum *may* be submitted in support of the summary judgment motion and that a brief or memorandum would then be helpful to further enlighten the court as to the law supporting their position), *trans. denied*. Liberty has not provided any authority which states that a party must designate its legal argument to the court when filing a response

Although the principle focus of our analysis involves the foreseeability aspect of the case, we are not at liberty to ignore our Supreme Court's holding in *Webb*. Accordingly, we will address, in some degree, the relationship of the parties and matters of public policy.

### 1. Relationship

We first address the relationship between the parties. In this case, there is no direct physical link between Hammock and Red Gold. The accident did not occur on Red Gold's property. There is no statute which places any special duty upon Hammock toward Red Gold. We can ascertain no factual circumstance which would establish a relationship between these two parties except the general relationship which exists between the motorist and the public at large to prevent the motorist from harming them. This general relationship is discussed in Comment e to the RESTATEMENT (SECOND) OF TORTS § 281 (1965), which states:

> "Thus the duty to exercise reasonable care in driving an automobile down the highway is established for the protection of the persons or property of others against all of the unreasonable possibilities of harm which may be expected to result from collisions with other vehicles, or with pedestrians, or from the driver's own automobile leaving the highway, or from narrowly averted collisions or other accidents."

In a case such as we have before us, the concern would be for the motorist to commit no act which would interrupt electrical service to any individual or business serviced by the electric utility poles along the road upon which the motorist is traveling. Whether this is sufficient to establish a duty depends upon the weight given to this factor in combination with the issues of foreseeability and public policy.

### 2. Foreseeability

Many factors come into play when discussing the foreseeability that a particular business or residence may be injured as the result of an automobile accident. While not an exhaustive listing, some of the relevant factors which immediately come to mind are the distance between the accident scene and the business; whether the accident occurred in a residential neighborhood, an industrial park, near a series of retail stores, out in an unpopulated rural area, in a small town, or in a highly populated and dense area of a major city; how electrical service is run to a particular location; whether the pole which was struck was part of the final series of lines carrying electricity to several houses or whether it was the source of power for several substations; whether the line leads directly onto a specific property; or even by how many lines are carried upon a particular pole.[10]

In determining whether Red Gold is a foreseeable victim which suffered a foreseeable type of harm, we begin by noting a

---

to a summary judgment motion. In any event, summary judgment is only appropriate when there are no genuine issues of material fact *and* the moving party is entitled to judgment as a matter of law. We see no reason to preclude an individual from arguing issues of law, which were not presented to the trial court in a brief or memorandum before a summary judgment hearing when such issues of law are relevant and will aid in the proper ruling on a summary judgment motion.

**10.** We recognize that enumeration of such factors might well transgress upon the *Goldsberry* duty analysis "without regard to the facts of the actual occurrence." 672 N.E.2d at 479. Be that as it may, we are not at liberty to rewrite the holding of *Webb* so as to alter the duty-foreseeability portion thereof.

basic proposition concerning electric service, that is, when an electric utility pole is struck, anyone who receives service from that line may have his service interrupted. Regardless of any of the above factors which are relevant to a discussion of foreseeability, it is indisputable that service could be interrupted to those residences or businesses which receive their electricity as part of the route which was damaged through the accident.

However, whether such a basic proposition results in the determination that Red Gold is a foreseeable victim is subject to serious dispute. As Hammock asserts, the foreseeability of harm seems to diminish as one proceeds further from the accident site. There is support for this contention in case law from other jurisdictions.[11] In *Palm Beach–Broward Med. Imaging Ctr., Inc. v. Continental Grain Co.*, 715 So.2d 343, 345 (Fla. 4th Dist.Ct.App.1998), the Florida District Court of Appeal determined that the foreseeable zone of risk created by the negligent operation of an automobile did not include an electricity consumer "some distance from the scene of an accident."[12] In *George A. Hormel & Co. v. Maez*, 92 Cal.App.3d 963, 155 Cal. Rptr. 337, 340 (1979), the California Court of Appeal determined that a "natural, logical, and foreseeable consequence of striking and destroying a power pole is the disruption of power service to those in the neighboring vicinity."[13] While the two courts in these cases differed in their deci-

sion whether there was a duty upon the motorist toward the injured business, both courts focused upon the distance from the accident scene to the business in determining whether the injury to the business was foreseeable.

In Indiana, there is precedent for relying upon what may be referred to as the zone of risk or danger in determining whether a duty exists. *See Indiana Limestone Co. v. Staggs*, 672 N.E.2d 1377, 1383–84 (Ind.Ct.App.1996) (relying upon whether in determining foreseeability one lawfully using a highway would come within the zone of danger posed by a quarry located twenty-five feet from the road), *trans. denied*. The zone of danger which one considers in relation to an automobile accident encompasses the area immediately surrounding the accident scene. This includes those areas which are unsafe because of downed power lines or the property which may have been directly damaged by an electric utility pole falling upon it. Red Gold was not located within that immediate zone of danger. Rather, the Plant was located over 2 miles from the accident scene. While not a direct indication that a duty should or should not exist, it hardly seems that being located over 2 miles from the accident scene would place one within the "neighboring vicinity" or the zone of danger.

Considering whether the injury suffered by Red Gold was a reasonably foreseeable

---

**11.** Our search for cases from other jurisdictions has revealed only a few cases addressing the issue of whether a motorist is liable to a business for damage resulting from a power failure following an accident in which an electric utility pole was struck. In addition to the two cases relied upon for support in this decision, we also direct attention to *Dunlop Tire & Rubber Corp. v. FMC Corp.*, 53 A.D.2d 150, 385 N.Y.S.2d 971 (N.Y.App.Div.1976) and *Geo. D. Barnard Co. v. Lane*, 392 S.W.2d 769 (Tex.Civ.App.1965).

**12.** The facts given by the District Court of Appeal do not reveal how far from the scene of the accident the business which suffered the injury was located.

**13.** Once again, the facts of the case do not reveal how far from the accident scene the business was located.

type of harm, we look to the types of harms that may befall any business which has its electric service interrupted for an extended period of time. As the quote from Comment e to the RESTATEMENT (SECOND) OF TORTS § 281 (1965) continues, "When *harm of a kind normally to be expected* as a consequence of the negligent driving results from the realization of any one of these hazards, it is within the scope of the defendant's duty of protection." (emphasis supplied).

While the most obvious types of harm with which a motorist would be appropriately concerned include the risk of electrical shock or physical damage to a pole or a structure upon which a pole falls, it is possible that other harms may also be normally expected. This could include such damages as the costs of lost production time, lost product, or even damage to sophisticated equipment. *See* RESTATEMENT (SECOND) OF TORTS § 281 cmt. g (1965) (providing that in determining whether the particular harm is within the scope of the risk created by the actor's conduct, "risk" is not limited to those hazards which a reasonable man would have in contemplation and take into account when planning his activity). *But see Palm Beach–Broward Med. Imaging Ctr., Inc.*, 715 So.2d at 345, *supra,* (holding that damage to equipment of a business was not the type of loss that has so frequently resulted from an automobile accident to make it likely to be expected again).

There is no dispute that upon some level it is foreseeable that a business which received electric service from a line which suffered damage after an electric utility pole was struck would lose electric service

and its processing operation would shut down. It also holds true that if the processing were of a perishable food item, the loss of power would result in spoilage and loss of product. However, just as determined by the court in *Palm Beach–Broward Med. Imaging Ctr., Inc.,* the scant amount of cases from across the United States which have dealt with such issue make it extremely unlikely that the damage suffered by Red Gold was the kind of harm which would normally be expected as the result of an automobile accident.

### 3. Public Policy

Finally, we must address the public policy concerns involved in holding a motorist liable for the injury suffered by a business following an interruption in electric service. On one hand, we have a business involved in a processing operation. On the other, we have an individual motorist who was involved in an accident. In looking at a processing operation, there is generally a risk that product could be damaged or destroyed whenever there is a power failure. This is especially true when the plant processes a perishable food item.

It is questionable who is, or should be, in the best position to prevent such injury and how society should allocate the costs of such injury. According to the affidavit of Hammock's expert, Oliver Max Myers, Red Gold faced large potential losses from the loss of electric service. He also stated that while there was no statutory duty upon Red Gold to utilize a second power source in the case of loss of electric service, in his opinion, sound engineering judgment would require that a second power source be considered at the Plant.[14]

**14.** It was also presented upon appeal that the trial court erred in striking Hammock's affirmative defenses of comparative fault and incurred risk. Hammock asserts that he should be allowed to argue that Red Gold's failure to

have a second power source was Red Gold's acceptance of the risk of power failure. Liberty and Red Gold argued at the hearing on the motion to strike that there was no duty for Red Gold to have a second power source.

While it is true that there is no statutory duty upon Red Gold to have a second power source in the event of loss of electric service, it is difficult to justify the imposition of the costs of a harm caused by the acceptance of a general risk of power failure by a business upon an individual motorist who was unfortunate enough to cause a widespread power failure. Should there have been a power failure caused by a storm or a widespread blackout, the business would have had to bear the costs. While a motorist may be ultimately responsible for causing a power failure through his negligent acts, that individual motorist is not in the best position to prevent or minimize the economic harm which results.

In this regard, public policy seems to militate against imposing the costs of the negligent driver's actions upon the driver, and instead, might well pass those costs onto the business which is better able to prevent the harm. This is especially true when considering the far-reaching consequences of holding a motorist liable for his negligent acts. Does the public believe that a motorist should be held liable to every homeowner and business if he interrupts electric service to several thousand electric consumers? What if electric service was interrupted to a hospital and several patients died as a result? Would society demand that the motorist pay? The answer to these questions is likely "no" because it seems unfair to place such extreme and indeterminate costs upon the negligent driver.

However, looking at the entire picture of negligent acts and the harms which could result from an automobile accident, it seems that there are some situations in which public policy would demand that the motorist bear the costs of his negligent act. Such situation could include damages caused to a single residence by the loss of electric service for several hours in the winter, thereby causing the water pipes to freeze and burst after a motorist struck a pole on an individual's property. Also, it would seem extremely unfair for a business to bear the costs of the damage caused by a negligent driver's act when no steps could be taken to prevent the harm to the business. Such might include when a business has two sources of electric power, one a primary source and the other a backup source, which are both damaged through the same negligent act of an individual. It is also possible that even though a backup system is in place and properly maintained, the backup system may fail to function in the event that the primary source of electric power is interrupted. In such circumstances, the injury will be the same as if the business did not have a backup power source, but one cannot reasonably expect a business to have backups to the backup power source. Once again, the question then becomes who should bear the costs of the negligent acts.

On one end of the spectrum, one may look at the facts present before this court and immediately conclude that the driver should not suffer the extreme conse-

---

The motion to strike was apparently granted upon that ground. While we agree that no statutory duty existed, the plain language of the Indiana Comparative Fault Act, Ind.Code § 34–51–2–5 (Burns Code Ed. Repl.1998), contemplates that Hammock would be allowed to present evidence of Red Gold's fault. "Fault" is defined to include the "unreasonable assumption of risk not constituting an enforceable express consent, incurred risk, and unreasonable failure to avoid an injury or to mitigate damages." Ind.Code § 34–6–2–45(b) (Burns Code Ed. Repl.1998). For purposes of this appeal, we also must include the failure of Red Gold to have a second source of power as a consideration of public policy issues in that the ability of Red Gold to prevent the harm weighs heavily upon whether society demands that Hammock bear the financial burden of his actions.

quences caused by his negligent actions. Whether one makes such determination because the harm does not seem foreseeable because it is too remote or too severe is not important, neither is it important whether one would believe that the motorist had no duty or that his negligence was not the proximate cause. What is important to the general public is that some results simply seem inappropriate. On the other end of the spectrum, we are faced with situations in which most individuals will look to a factual situation and immediately feel that the harmed individual or business should receive compensation from a negligent motorist. Once again, public policy is not best based upon the immediate reaction to who has a duty or was the proximate cause of the harm, but rather to what seems fair. However, as an appellate court, we may not tie our determination to what "feels right" but must make our decision within the parameters of the law. As we view the desires of public policy through the lens of duty, we must remember that we are making a determination based upon only the first factor of a negligence issue. As previously stated, duty is a factor which as a general proposition is a pure question of law. *P.T. Barnum's Nightclub,* 766 N.E.2d at 737.

In determining whether a duty exists, at least for the purposes of deciding whether there is a foreseeable victim who has suffered a foreseeable harm, we look only to the most general facts. This proposition of looking to the most general facts also is relevant to our review of public policy. While we could look to every specific fact which encompasses the act and the end result of harm, we would in effect be making a determination of duty, proximate cause, breach, and comparative fault under the guise of public policy. Based upon such consideration, we cannot say that public policy always or never weighs in favor of holding a motorist responsible for his negligent acts which result in the interruption of electric service and damage to a particular business's products and equipment. Because public policy does not provide us with a clear answer of who should bear the costs of a motorist's actions, we do not believe it proper to always preclude a business, upon public policy considerations regarding a motorist's duty, from recovering for harm it suffers as a result of a motorist's negligent act. That being said, in this case, public policy considerations do seem to weigh most heavily against placing Hammock in a position in which he owed a duty toward Red Gold.

### 4. Balance of Factors

In reaching our decision, it is necessary to discuss the difficulty a court faces when applying the legal concepts to be used in review of a case based upon a tort claim of negligence. This is most evident when we must attempt to apply the facts available upon review of a summary judgment to the appropriate legal concepts. While our decision must necessarily be broad, in reality, the ultimate decision must be made based upon minor nuances in the law and how we apply those nuances to the facts.[15] This is not totally satisfactory given the subtle shadings between the concept of foreseeability as a factor for both duty and proximate cause. This dissatisfaction is heightened when one considers the question of whether the ultimate decision should be for a jury as the trier of fact or for the court, as public policy issues seem to weigh

---

**15.** We have found ourselves unable to avoid walking a torturous path in attempting to resolve the issues presented in this appeal. Very possibly, we have not clarified the messages of *Webb* and *Goldsberry.* To the contrary, we may have merely muddied the waters further. Be that as it may, perhaps our Supreme Court will find it appropriate to undertake a re-evaluation of the existing law in such cases.

most heavily upon finding that what would otherwise be negligent conduct will be forgiven in certain situations. This is most evident in the court's responsibility to determine duty as a matter of law. However, given the status of the law, as a court we must do the best we can in applying the facts to the applicable law and hope that our decision meets squarely with what society deems correct and directs the law in such a way to assist in the prevention of negligent conduct rather than to invoke liability in an area in which it should not exist.

Relying upon the guidance of decisions from other jurisdictions and balancing the three *Webb* factors, we conclude that Hammock did not owe a duty to Red Gold. While the accident in which Hammock was involved did ultimately result in a loss of electric service to Red Gold, this only establishes that Hammock was the cause-in-fact of the harm suffered by Red Gold. In order for Hammock to be liable for that harm, he first must owe a duty to Red Gold. In this case, the consequences of the accident were not reasonably foreseeable because the Plant was located some distance from the scene of the accident, outside of the zone of danger. Also, the scarcity of cases from across the United States which have dealt with the issue of whether a motorist owes a duty to a business following the disruption of electric service as a result of an accident leads to the conclusion that the harm is not so common as to normally be expected. Finally, in viewing public policy, a combination of factors, including the size of the operation at the Plant, Red Gold's failure to have a second power source, and the fact that Red Gold was in a better position to prevent the significant amount of harm which resulted as a consequence of the accident, lead us to conclude that public policy weighs against the existence of a

duty. Balancing these considerations together, we can only conclude that Hammock did not owe a duty to Red Gold. The trial court erred in granting summary judgment in favor of Liberty. Rather, as no duty existed, summary judgment should have been entered in favor of Hammock.

The judgment of the trial court is reversed. The cause is remanded for the trial court to enter summary judgment in favor of Hammock.

BARNES, J., concurs.

BAILEY, J., dissents with opinion.

BAILEY, Judge, dissenting.

I think Hammock had a legal duty to use due care to avoid accidents and to keep his vehicle under reasonable control, and I therefore respectfully dissent from the majority's conclusion that summary judgment was improperly denied.

As the majority notes, the main focus of the Court's analysis is the foreseeability of the harm to Red Gold as it relates to the existence of a legal duty on the part of Hammock. This, as the majority correctly explains, is because the Indiana Supreme court explained in *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind.1991) that the existence of a legal duty depends upon the analysis and balancing of the relationship between the parties, the foreseeability of harm to the injured person, and concerns of public policy. In its comprehensive and thoughtful discussion of the topic, the majority notes that this Court attempted to remedy some of the confusion created by the *Webb* decision in *Goldsberry v. Grubbs,* 672 N.E.2d 475 (Ind.Ct.App.1996). Specifically, *Goldsberry* recognized that by addressing the foreseeability of harm both as a component of the duty analysis and as a part of the determination of proximate cause, the *Webb* analysis had the potential

of rendering separate analyses of the two concepts superfluous. *Id.* at 479.

The *Goldsberry* decision resolved this problem by recognizing that if foreseeability were to be a component of both duty and proximate cause, the analysis of foreseeable harm would have to be different at each respective stage. In particular, *Goldsberry* concluded that while the foreseeability component of proximate cause involved an after-the-fact analysis of circumstances that actually occurred, the foreseeability component of the duty analysis necessarily entailed a lesser inquiry into "the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." 672 N.E.2d at 479. This Court explained that

> while the facts of a particular occurrence are relevant when considering whether a breach of a duty occurred and whether that breach was the proximate cause of the plaintiff's injuries, such facts are simply not relevant to the determination of whether a duty existed. To look to the facts of a particular occurrence when deciding the duty question would subsume the entire law of negligence, i.e., duty, breach, and proximate cause, into the duty question.

*Id.* The majority properly highlights this aspect of the *Goldsberry* decision, and the approach to the foreseeability question set out in that case remains the key to harmonizing *Webb*'s duty analysis with the common law of negligence. While I fully agree with the majority's understanding of the distinction between the different foreseeability analyses for duty and proximate cause, I disagree with the majority's application of the foreseeability component in this case.

The majority says that Red Gold was not a sufficiently foreseeable plaintiff that had suffered reasonably foreseeable harm, reasoning that Red Gold was well outside of the "zone of danger" created by Hammock's alleged negligence, and that the kind of harm suffered by Red Gold was not the kind of harm normally expected to result from a motor vehicle accident. In *Goldsberry,* however, this Court observed that "it is foreseeable that motorists (or their occupants) will leave the traveled portion of a road and strike utility poles set and maintained along that road." 672 N.E.2d at 480. It is true that we made this statement in connection with determining whether a telephone utility company owed a duty in connection with its placement of a telephone pole to a driver injured after colliding with the pole. *See, id.* at 477. Nevertheless, the fact remains that such collisions are foreseeable. And if it is foreseeable that motorists may crash their vehicles into utility poles, it is certainly foreseeable that such accidents may damage the utility poles as well as attached electrical wires and associated hardware. It is further rational to predict that such damage might likely lead to the interruption of electrical power service to those receiving electricity through wires attached to the damaged utility pole.

Given the nature of electrical power and its supply along extended lines of variable lengths, I do not think that the distance from the accident site to the electrical power customer is dispositive of the foreseeability question. Rather, all who are directly connected to the supply of electrical power through a utility pole constitute the "broad type of plaintiff" reasonably expected to be damaged in such accidents. Similarly, the kind of damage allegedly sustained by Red Gold amounted to the broad type of harm reasonably anticipated as a result of this kind of an accident. The majority states that the absence of reported cases involving similar damage indicates that the damage was not what would normally be expected in such accidents.

The majority recognizes, however, that "upon some level it is foreseeable that a business which received electric service from a line which suffered damage after an electric utility pole was struck would lose electric service and its processing operation would shut down." Op. at 503. In light of *Goldsberry's* instruction to analyze foreseeability from a more general level of abstraction and "without regard to the facts of the actual occurrence," 672 N.E.2d at 479, I think that the level described by the majority is precisely that at which we must judge foreseeability as part of the duty analysis in this case. Accordingly, under the general and low-threshold foreseeability analysis applicable to the duty inquiry, Red Gold was a reasonably foreseeable victim sustaining alleged damages that were to be reasonably anticipated as a result of the kind of reasonably foreseeable accident involved here. The foreseeability factor therefore supports the imposition of a duty in this case.

I also think that the relationship and public policy factors weigh more heavily in favor of the existence of a legal duty than the majority's analysis suggests. The duties owed by operators of motor vehicles in this state are well-established, and include the obligation to use due care to avoid collisions and to maintain one's automobile under reasonable control. *E.g., Cole v. Gohmann,* 727 N.E.2d 1111, 1115 (Ind.Ct.App.2000). This basic common-sense conception reflects these *Webb* factors.

First, while persons injured as a result of motor vehicle accidents rarely have a pre-existing relationship with the operator of the motor vehicle involved in an accident, the general relationship between and among those driving motor vehicles on public roads, as well as the relationship between motor vehicle operators and those who might be injured by their negligent operation, is plainly sufficient to support the existence of the duty on behalf of the operator to use due care to avoid accidents that might injure such persons. As a business that could be expected to sustain damage as a result of a reasonably foreseeable accident caused by a negligent motorist, Red Gold had enough of a relationship with a driver like Hammock to support the imposition of a duty. Moreover, the imposition of such a duty is entirely consistent with the sound policies of encouraging careful driving and compensating those injured by negligent motorists.

None of this is to say that Hammock's alleged negligence was the proximate cause of Red Gold's damages. As we noted in *Goldsberry,* " '[a] negligent act or omission is the proximate cause of an injury if the injury is a natural and probable consequence which, *in light of the circumstances,* should reasonably *have been* foreseen or anticipated.' " 672 N.E.2d at 479 (quoting *City of Portage v. Lindbloom,* 655 N.E.2d 84, 86 (Ind.Ct.App.1995) (emphasis supplied)). For the reasons discussed above, this foreseeability inquiry is necessarily more stringent than that conducted for purposes of determining whether a duty exists, and requires an after-the-fact analysis of the circumstances that actually occurred. *See id.* at 479. While the question of proximate cause is often an issue for the trier of fact, the determination may be made as a matter of law where it is clear that the injury actually sustained was not foreseeable under the circumstances and that the imposition of liability upon the original negligent actor would not be justified. *Arnold v. F.J. Hab, Inc.,* 745 N.E.2d 912, 917 (Ind.Ct.App.2001). The majority's foreseeability analysis here, while addressed to the duty component, amounts to a persuasive case that Red Gold's damages were not the proximate result of Hammock's alleged negligence.

Hammock did not, however, seek summary judgment on this basis, and has not presented this argument upon appeal. I therefore respectfully dissent from the majority's conclusion that Hammock was entitled to summary judgment on the ground that he owed no duty to Red Gold.