Cynthia J. COX, Administrator for the Estate of William Eric Cox, Appellant–Plaintiff,

v.

STOUGHTON TRAILERS, INC., Appellee–Defendant.

No. 73A04–0504–CV–226.

Court of Appeals of Indiana.

Nov. 30, 2005.

Thomas M. Harris, Jerome Mirza and Associates, Ltd., Bloomington, Jerry Garau, Findling Garau Germano & Pennington, Indianapolis, for Appellant.

Dane L. Tubergen, Fort Wayne, for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Cynthia Cox ("Cox"), as administrator of the Estate of William Cox ("William"), appeals the trial court's grant of summary judgment in favor of Stoughton Trailers, Inc. We affirm.

### Issue

The restated issue before us is whether the trial court properly concluded that Stoughton owed no duty to William to maintain the safety of a trailer that it had manufactured and that caused William's death.

## Facts

Stoughton, located in Wisconsin, manufactured the trailer at issue in this case in 1996 and leased it to Silliman Trucking, located in Florida, later that year. In June 2001, the lease was renegotiated between Stoughton and Silliman's successor, Great Southern Logistics, and covered the subject trailer and nineteen others. The lease required Great Southern to maintain, service, and repair the trailers at its own expense. The lease also gave Stoughton the right to declare Great Southern in default, and take possession of the trailers, if lease payments went unpaid for more than twenty days. The lease was set to expire on December 15, 2004.

By September 2001, Great Southern was $22,000 in arrears on the lease. Stoughton's vice-president of finance had discussions with Great Southern's president, Charles Silliman, regarding the delinquent lease payments. By October 2001, the parties had a mutual understanding that Great Southern would either assist Stoughton in repossessing the trailers, or in helping Stoughton sell them to another party. In the meantime, Stoughton allowed Great Southern to continue using the trailers, and Stoughton never sent Great Southern a written notice of default. There is some deposition testimony by Stoughton's vice-president of finance suggesting that it was more economically sound to follow this procedure than attempting to physically repossess the trailers.

In October or November 2001, Stoughton entered into negotiations with a third party, GTS Truck and Trailer Sales, to purchase the trailers. GTS was under the impression that Stoughton could sell the trailers directly to it and apparently was unaware at the time of negotiations that they were in Great Southern's actual possession. GTS and Stoughton negotiated a purchase price for the trailers as of November 19, 2001. However, GTS did not pay for the trailers until December 22, 2001, after GTS had an opportunity to inspect the trailers it was to purchase. After GTS purchased the trailers, it immediately reconveyed them to Charles Silliman's wife Dianne.

On December 13, 2001, the sale of the trailers to GTS was pending, and they were still in Great Southern's possession. Stoughton's vice president of finance, however, believed that as of that date the lease between it and Great Southern "was no longer valid ... from a practical business standpoint." App. p. 158. On that date, one of the dual wheels became detached from the trailer at issue while traveling on Interstate 74 in Shelby County. The wheels crossed the interstate median and struck a vehicle in which William was a passenger, causing the vehicle to crash and killing William.

On November 27, 2002, Cynthia Cox, as administrator of William's Estate, sued a number of parties, including Stoughton, Great Southern, GTS, and Ademir DeAguiar, the driver of the tractor-trailer at the time of the accident. The complaint specifically alleged that Stoughton negligently failed to maintain and adequately inspect the trailer and that this negligence had caused the trailer wheels to become detached from the trailer and caused William's death. There has been no claim that the trailer was defective or dangerous when Stoughton first delivered it to Great Southern's predecessor. On June 25, 2004, Stoughton moved for summary judgment, asserting that it had no duty to maintain or inspect the trailer at the time of the accident because "it lacked requisite possession and control" of the trailer. App. p. 52. The trial court granted

Stoughton's summary judgment motion, and Cox appeals that ruling.[1]

## Analysis

Summary judgment is appropriate only if the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C); *Beta Steel v. Rust*, 830 N.E.2d 62, 67 (Ind.Ct.App.2005). Courts must construe all facts and reasonable inferences drawn from those facts in favor of the nonmoving party. *Beta Steel*, 830 N.E.2d at 67. The review of a summary judgment motion is limited to those materials designated to the trial court, and appellate courts must carefully review decisions on summary judgment motions to ensure that parties are not improperly denied their day in court. *Id.*

 The three elements of the tort of negligence are: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach.[2] *Id.* at 69. Summary judgment must be carefully considered in negligence cases because they are particularly fact sensitive and are governed by the objective reasonable person standard—one best applied by a jury after hearing all of the evidence. *Id.* However, whether a duty exists generally is a question of law for the court to decide. *Id.* at 70. Sometimes, the existence of a duty depends upon underlying facts that require resolution by the trier of fact, and this may include questions regarding who controlled property at the time and place of an accident. *Id.* The present case concerns solely the duty element of the tort of negligence—whether Stoughton had a duty, applicable to William, to inspect the trailer and maintain it in safe working condition.

 The first issue in this case is the applicable standard in determining whether Stoughton owed a duty to William. First, there is the *Webb* general duty formulation, which examines and balances: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind.1991). The *Webb* test, however, is inapplicable in cases where the element of duty has already been declared or otherwise articulated under a different test. *See Northern Indiana Public Service Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind.2003). In this regard, both parties assert that this case can be analyzed under either *Webb* or principles of premises liability and its established duty standard, independent of *Webb*. We conclude that *Webb* must be our primary guide because no Indiana case appears to be directly on point with the facts of this case as to whether a duty should be owed in such a situation.[3] How-

1. This appeal only concerns Cox's claims against Stoughton. The current status of the other defendants is unclear because Cox's appendix does not include a copy of the chronological case summary as required by Indiana Appellate Rule 50(A)(2)(a).

2. We note that Stoughton and Cox presumably accept that Indiana law controls here because they have relied exclusively on Indiana law in their briefs; we are aware that two of the key parties in this case, Stoughton and Great Southern, are located respectively in Wisconsin and Florida.

3. Premises liability principles were applied directly in one Indiana case involving personal property: *Harris v. Traini*, 759 N.E.2d 215 (Ind.Ct.App.2001), *trans. denied*. *Harris*, which concerned an accident on a houseboat, appears to be readily distinguishable from this case. First, the defendants in that case had waived their argument on appeal that the case should not be analyzed under premises liability law. *Id.* at 221–22. Second, waiver notwithstanding, this court noted that the houseboat was large and equipped with a kitchen and bathroom, thus making it very similar to a residence located on land. *Id.* at

ever, we will take some guidance from premises liability cases and other areas of law in applying the *Webb* factors and analyzing whether Stoughton owed a duty to William.

We also observe at the outset that portions of the parties' briefs in this case discussed whether the lease between Stoughton and Great Southern was still valid or in effect at the time of the accident, notwithstanding Great Southern's substantial default under that lease. At oral argument, counsel for Stoughton characterized Cox's argument that the lease was no longer valid as a "red herring" for purposes of analyzing the duty question in this case. We conclude this essentially amounted to a concession by Stoughton that it is largely irrelevant here whether the lease technically was still in effect at the time of the accident.

 Turning to the *Webb* factors, the first is the relationship between the parties, which here would be the relationship between Stoughton and William. There was no relationship between them in any traditional sense. Generally, a relationship exists between a motorist and the public at large to prevent the motorist from harming members of the public. *Hammock v. Red Gold, Inc.*, 784 N.E.2d 495, 501 (Ind.Ct.App.2003), *trans. denied.* Such a relationship might be sufficient to impose on a motorist a duty to maintain a vehicle in safe working condition, in addition to safely operating the vehicle. Whether such duty should extend not only to an operator of a vehicle, but also to an owner of a motor vehicle who is not in direct control or possession of a vehicle

because of a lease or other arrangement, is a much more difficult question. Any relationship between an owner of a motor vehicle who has voluntarily relinquished control of the vehicle to a third party for a substantial period of time and the general public is attenuated at best. "Whether this is sufficient to establish a duty depends upon the weight given to this factor in combination with the issues of foreseeability and public policy." *Id.*

 The requirement of foreseeability is different and less demanding in the context of the *Webb* duty analysis than it is in the context of determining proximate cause. *See Red Gold,* 784 N.E.2d at 499–500. "[F]oreseeability for the purposes of duty involves a general and broad analysis of the plaintiff and the harm involved without regard to the facts of the occurrence." *Id.* at 500. Cox argues, "it is readily foreseeable that an unsafe vehicle would pose a risk of harm to other motorists sufficient to warrant the imposition of a duty." Appellant's Br. p. 17. This argument is difficult to disagree with. However, the issue here is whether Stoughton should have foreseen that Great Southern, who had exclusive possession and use of the trailer for several years, would fail to maintain the vehicle and that such failure would cause an accident.

This case bears some similarites to *Williams v. Cingular Wireless,* 809 N.E.2d 473, 478 (Ind.Ct.App.2004), *trans. denied,* in which this court held that although it conceivably was foreseeable that misuse of a cell phone while driving might cause an automobile accident, this was insufficient

---

222. The trailer in this case is not comparable to a residence, nor is the type of injury sustained similar to one that might be caused by a defect in real property. A third reason for not applying premises liability law directly to this case is that the duty of a landowner varies according to the status of the person coming onto the land, either as an invitee, licensee, or trespasser. *See id.* Clearly, in this case William did not "come onto" any property owned by Stoughton, and any duty Stoughton might have owed him is not dependent on William's status as invitee, licensee, or trespasser.

to find it was foreseeable "to a legally significant extent" that selling the cell phone in the first place would cause an accident for purposes of a *Webb* duty analysis. Here, likewise, there are two levels of foreseeability: first, that Great Southern would not maintain the trailer, and second, that such failure could result in an accident. There is no claim here that Stoughton had any actual knowledge of a failure to maintain on Great Southern's part. Cox contends in her reply brief that Stoughton should have been on alert that Great Southern might not properly maintain the trailer because Great Southern failed to make lease payments. This is a legitimate concern, but it is not a compelling demonstration of foreseeability. This factor must be weighed against the other two *Webb* considerations.

The final consideration is public policy. This court has indicated that this *Webb* factor analyzes "who is, or should be, in the best position to prevent [an] injury and how society should allocate the costs of such injury." *Red Gold*, 784 N.E.2d at 503. In weighing public policy concerns, we find guidance from statutes governing vehicle safety and cases in the area of premises liability, bailments, and negligent entrustment. These are instructive because they reflect public policy choices regarding who was in the best position to prevent injury in fact situations that are similar, but perhaps not identical, to this case.

■ Indiana Code Section 9–21–7–1 prohibits the operation of an unsafe motor vehicle or motor vehicle-trailer combination by those who "drive or move" on a public highway. *See Stapinski v. Walsh Const. Co., Inc.*, 272 Ind. 6, 11, 395 N.E.2d 1251, 1254 (1979) (addressing predecessor statute). Indiana Code Section 9–19–1–5 prohibits an owner of a vehicle from causing or knowingly permitting an unsafe vehicle or vehicle-trailer combination from

being operated by another person. *See id.* Liability under Section 9–21–7–1 by its terms only extends to the person actually driving or moving an unsafe vehicle. *See id.* Liability under Section 9–19–1–5 would require some evidence that Stoughton, as the vehicle's owner, was aware that the trailer was unsafe at the time of the accident and still allowed Great Southern to operate it. Thus, public policy as reflected by these statutory vehicle safety schemes clearly assigns responsibility for maintenance to a vehicle operator or a vehicle owner who allows another to operate a vehicle with some degree of knowledge that it is unsafe. There is no designated evidence that Stoughton had any such knowledge regarding the trailer at issue here.

■ With respect to premises liability, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred. *Beta Steel*, 830 N.E.2d at 70. "Liability for injury ordinarily depends upon the power to prevent injury." *Mishler v. State*, 730 N.E.2d 229, 231 (Ind. Ct.App.2000). The duty imposed upon an owner or occupier of property to maintain it in a reasonably safe condition for the benefit of others co-exists with possession and control of the property. *Id.* The crux of the difference between Cox and Stoughton on the issue of "control" seems to be that Cox argues that "possession and control" of property for duty purposes can be constructive, while Stoughton argues that such "possession and control" must be actual. Implicitly, Cox seems to concede that Stoughton did not have actual possession and control of the trailer at the time of the accident but that its "constructive" possession and control—by verbally declaring Great Southern in default, negotiating for the trailers' sale, and its right to immediate possession of the trailers under

the lease after the default—was sufficient to impose on Stoughton a duty to maintain the trailers.

We conclude that premises liability cases generally have required an owner of property to have some degree of actual control over the property—not merely constructive ability to control—in order for a duty to prevent injury to attach to the owner. For example, in *Rhodes v. Wright,* 805 N.E.2d 382 (Ind.2004), the Indiana Supreme Court held that there was a material issue of fact regarding whether a farmer owed a duty to a Tyson Chicken employee killed while helping catch chickens at the farm. Specifically, it concluded the following facts demonstrated a question of fact, sufficient to preclude summary judgment, regarding whether the farmer or Tyson controlled the premises at the time of the accident: the farmer (1) owned the loading area where the accident occurred; (2) was responsible for maintaining that loading area; (3) determined who could enter the property and when; (4) received advance notice of Tyson's scheduled arrivals; (5) gave permission to Tyson to operate the forklift on the property; (6) was required under the contract with Tyson to be present while the chickens were caught; and (7) controlled the lighting (or lack thereof) at the loading area, which allegedly contributed to the death. *Id.* at 386. It appears the farmer-defendant in *Rhodes* had much day-to-day direct control and involvement in the use and maintenance of the farm. By contrast, Stoughton had no involvement in the day-to-day usage of the trailers it had voluntarily relinquished to Great Southern and which had been exclusively controlled by Great Southern or its predecessor for several years before the accident.

Also instructive is *Reed v. Beachy Const. Corp.,* 781 N.E.2d 1145 (Ind.Ct.App.2002), *trans. denied.* In that case, a person was injured when taking a "Parade of Homes" tour of a newly constructed house. The person sued both the home builder and the title owners of the house. This court held that, as a matter of law, the homeowners owed no duty to the injured person because they had agreed to delay moving into the house to allow it to be used in the tour and had only moved a few miscellaneous items into the home at the time of the accident. *Id.* at 1149. We held the homeowners "were neither in possession nor in control of the premises during the home show. As we have seen in other cases, the simple fact of ownership is not necessarily dispositive of the question of possession or control and the duty that arises therefrom." *Id.* at 1150. Actual control was the dispositive factor for duty purposes in *Reed,* not constructive ability to control. Presumably, the homeowners had a right to immediate possession of the house at the time of the accident but had voluntarily refrained from actually doing so. Likewise, Stoughton had a right to immediate possession of the trailers following Great Southern's default, but it chose to allow them to remain within Great Southern's possession and control.

We also believe the law of bailments is relevant to this case. That is, even assuming there was no longer a valid lease between Stoughton and Great Southern at the time of the accident, Stoughton willingly permitted Great Southern to maintain actual possession and control over the trailers. This begs the question: what was the legal nature of the relationship between Stoughton and Great Southern at the time of the accident, if not lessor-lessee? We observe that "A bailment arises when: (1) personal property belonging to a bailor is delivered into the exclusive possession of the bailee and (2) the property is accepted by the bailee." *Kottlowski v. Bridgestone/Firestone, Inc.,*

670 N.E.2d 78, 82 (Ind.Ct.App.1996), *trans. denied.* To constitute delivery, there generally must be such a full transfer, either actual or constructive, of the property to the bailee as to exclude the possession of the owner and all other persons and give to the bailee, for the time being, the sole custody and control of the property. *Id.* "Acceptance requires either an express contract to take the article and later redeliver it, or circumstances from which such a contract can be implied." *Id.*[4] Under this description of a bailment, Stoughton arguably was a bailor and Great Southern a bailee with respect to the trailer, even if the lease between the parties was not valid at the time of the accident.

As for a bailor's liability to third parties for injuries caused by property entrusted to a bailee, this court has held, "Negligence may not be imputed from a bailee to the bailor ... unless the bailor has reserved such direction and control as to make the act of the bailee that of the bailor." *Walters v. Dean,* 497 N.E.2d 247, 252 (Ind.Ct.App.1986). This case is not directly on point here because, strictly speaking, Cox is not attempting to impute negligence from Great Southern to Stoughton. However, an Ohio court has held:

> A bailor is generally held not liable for injuries resulting to a third person from a defective condition of the subject of the bailment arising subsequent to the delivery thereof to the bailee, unless he has assumed the responsibility of keeping it in repair, in which case he may incur liability by a failure to use proper care to remedy or give warning of such defective condition after having received or become chargeable with notice thereof.

*Taylor v. Standard Oil Co. of Ohio,* 130 N.E.2d 391, 394 (Ohio Ct.App.1954). The Ohio court was quoting language from the original version of American Jurisprudence; the same language appears in the current version. *See* 8A Am.Jur.2d 635, *Bailments* § 186 (1997). This section also states, "In the absence of a special agreement, the bailor is under no duty to inspect or repair the bailed property while it is in the bailee's possession." *Id.* at p. 634. Under the public policy reflected in American Jurisprudence, Stoughton should have been absolved of responsibility for maintaining the trailer by entrusting it to Great Southern, regardless of whether there was a legally binding lease between the parties, unless there was evidence Stoughton assumed responsibility for such maintenance. There is no such evidence.

■■■■ Finally, closely related to bailment is the law of negligent entrustment. Negligent entrustment does not hinge on the nature of the chattel or instrumentality provided, but on the supplying of the chattel for probable negligent use. *Johnson v. Patterson,* 570 N.E.2d 93, 96 (Ind. Ct.App.1991). The general rule is that when an instrumentality passes from the control of a person, his or her responsibility for injuries inflicted by it ceases. *Id.* An exception exists where the instrument is entrusted to one who is incompetent or irresponsible or who lacks the capacity to safely use or operate the instrumentality. *Id.* "It is insufficient to impose liability where the defendant did not know but could have or should have known of the entrustee's propensity to act in a negligent manner." *Id.* at 96–97. This case does not fall within the usual negligent entrustment case fact pattern, such as entrusting a vehicle or firearm to an intoxicated indi-

---

4. American Jurisprudence notes that although the terms "lessor" and "lessee" are not synonymous with the terms "bailor" and "bailee," a lease agreement may create a bailment. *See* 8A Am.Jur.2d 467, *Bailments* § 2 (1997).

vidual. It is instructive that public policy generally dictates that a party who entrusts personal property to another party is not liable for the other's misuse of the property, unless the entruster had some actual knowledge of a propensity for negligent use of the property by the other party. There is no evidence in this case of such knowledge by Stoughton.

With respect to the policy implications of this case specifically, we conclude that imposing liability upon Stoughton for this accident could have negative consequences for the widespread practice of long-term vehicle and equipment leasing, both in the commercial and consumer contexts, with little corresponding benefit. That is, even in the event of a default under a lease, the lessee of the property is still in the best position to maintain the property and should directly bear the onus of such maintenance until such time as a lessor regains actual control and possession of the property. Cox suggests that holding a lessor liable for a failure to maintain a vehicle following the lessee's default could be confined to the commercial arena so as not to impact consumer automobile lessors such as General Motors or Ford. We see no principled reason for such a distinction. Cox also contends that the sheer length and amount of Great Southern's default in this case was sufficient to impose an obligation upon Stoughton to ensure the trailer was being properly maintained. We believe it would be very difficult to assess, on a case-by-case basis, whether a default was of sufficient length and seriousness to impose a duty of maintenance on a vehicle lessor. Rather, the rule of actual possession and control of the property, as reflected in premises liability cases, provides a more predictable barometer for duty.

We now balance the three *Webb* factors. First, the relationship between Stoughton and William, the injured party, is highly attenuated. Second, regarding foreseeability, it is conceivable Stoughton might have had some reason for concern regarding the maintenance of the trailers based on Great Southern's apparent financial difficulties; however, the foreseeability of what transpired in this case from Stoughton's standpoint is not substantial. Third, public policy implications of this case and as reflected in choices made in the area of premises liability, bailments, negligent entrustment, and statutory vehicle safety requirements indicate that an owner of property who relinquishes actual control over the property to a third party generally is not liable for injury caused by the property while it is still within the third party's possession and control. A different result might obtain if the property owner has some actual knowledge of the dangerousness of the property or the third party's propensity to act negligently.

The designated evidence in this case demonstrates as a matter of law that Stoughton had relinquished actual control and possession over the trailer to Great Southern and its predecessor for a continuous period of several years up to and including the date of the accident, notwithstanding Stoughton's stated, but not yet completed, intention to sell the trailer because of Great Southern's default under the lease. There is no designated evidence that Stoughton had any actual knowledge of a failure to maintain the trailer by Great Southern, nor that Great Southern had a propensity for negligence, nor that Stoughton had voluntarily undertaken to maintain the trailer. Under the specific facts of this case and considering and balancing the *Webb* factors, we hold that Stoughton owed no duty to William, or other members of the general public, to maintain and/or inspect the trailer on the date of the accident.

## Conclusion

The trial court correctly entered summary judgment in Stoughton's favor because there is no designated evidence that would support finding that Stoughton owed a duty to William to maintain the trailer. We affirm.

Affirmed.

CRONE, J., and NAJAM, J., concur.