**Lorean EVANS, Henry Evans, and Tom Vaughn, Trustee of the Bankruptcy Estate of Lorean Evans and Henry Evans, Appellants–Plaintiffs,**

v.

**BUFFINGTON HARBOR RIVER BOATS, LLC., Valet Parking Services, Inc., Huber, Hunt & Nichols, Inc., Design Workshop, Inc., Rieth–Riley Construction Co., Inc., Sosh Architects, and Cole Associates, Inc., Appellees–Defendants.**

No. 45A05–0212–CV–575.

Court of Appeals of Indiana.

Dec. 8, 2003.

Rehearing Denied Jan. 29, 2004.

Kenneth J. Allen, James E. Brammer, Kenneth J. Allen & Associates, P.C., Valparaiso, IN, Attorneys for Appellants.

Patrick J. Fanning, Law Office Zurich American Insurance Group, Chicago, IL, Attorneys for Buffington Harbor Riverboats.

Richard P. Komyatte, Richard P. Komyatte & Associates, PC, Highland, IN, Attorneys for Design Workshop, Inc.

Dane L. Tubergen, Lynn E. Kalamaros, Hunt, Suedhoff, Kalamaros, LLP, Fort Wayne, IN, Attorneys for Cole Associates, Inc.

Ryan L. Leitch, Michael Patrick Dugan, Riley Bennett & Egloff, LLP, Indianapolis, IN, Attorneys for Huber, Hunt & Nicohols, Inc.

**OPINION**

SULLIVAN, Judge.

■ Lorean and Henry Evans appeal following the jury trial in which Lorean was awarded damages for injuries she received in a fall upon property owned by Buffington Harbor Riverboats, LLC. They present three issues for our review: [1]

---

1. In their reply brief, the Evanses take the position that the trial court erred in failing to strike two jurors for cause and that the failure was further proof of juror misconduct. In the appellant's brief filed by the Evanses, they noted that the trial court failed to strike certain jurors for cause. They further stated that they had requested the entire jury trial to be transcribed but that the court reporter failed to include the jury voir dire in the transcript. The Evanses then stated that they would amend their brief and appendix to include citations to the transcription of the jury voir dire. Nonetheless, they never amended their brief or appendix, nor did they make any argument in their appellant's brief in regard to the failure to strike jurors for cause. Therefore, the issue of failure to strike jurors

I. Whether the jury relied upon extraneous prejudicial information;

II. Whether the damage award was inadequate; and

III. Whether the trial court erred in granting summary judgment in favor of Huber, Hunt & Nichols, Inc. and Design Workshop, Inc.

Cole Associates, Inc., also a defendant in the trial court, cross appeals claiming that the trial court erred in denying its Motion for Summary Judgment. We perceive no reason to address this matter because the jury found no liability on the part of Cole. The net effect is as if Cole had been awarded the summary judgment. Valet Parking Services, Inc., which was found to be partly liable for Lorean's injuries, has not filed a brief in this appeal.

We affirm in part, reverse in part, and remand.[2]

Late in the evening hours of July 27, 1998, Lorean Evans finished an appointment she had at approximately 10:00 p.m. and went to a riverboat casino in Gary, arriving at approximately 1:00 a.m. She exited the casino at approximately 3:00 a.m. on July 28. She waited in line for several minutes to get her car. Eventually, a valet parking attendant gave her the keys to her car so that she could retrieve it herself. Lorean then walked across the driveway in front of the entrance to the casino pavilion upon what appeared to be a sidewalk.[3] The concrete band progressed between a row of shrubs and ended at a retaining wall which dropped approximately thirty inches into the parking lot. Lorean fell when she stepped off of the concrete band into the parking lot. She injured her knee and had to have surgery to correct the fracture of her tibia plateau.

The following year, Lorean filed suit against Buffington Harbor Riverboats, LLC ("Buffington Harbor"), the Majestic Star Casino, LLC, and Trump Indiana, Inc. On March 13, 2000, both Majestic Star Casino and Trump Indiana were dismissed from the lawsuit by agreement of the parties. On April 14, 2000, Valet Parking Services, Inc. ("Valet Parking") and Huber, Hunt & Nichols, Inc. ("HHN") were added as defendants. Cole Associates, Inc., n/k/a DLZ, Indiana Inc. ("Cole"), was subsequently added as a defendant, as were Design Workshop, Inc., Rieth–Riley Construction Co., Inc., and SOSH Architects. On May 1, 2001, SOSH Architects was dismissed from the suit. Rieth–Riley sought summary judgment which Lorean did not challenge. Summary judgment was granted for Rieth–Riley on December 12, 2001. A hearing on the summary judgment motions filed by HHN, Design Workshop, and Cole was held on December 12, 2001. Summary judgment was granted for HHN and Design Workshop but denied for Cole.

A trial was conducted as to the liability of Buffington Harbor, Valet Parking, and

---

has been waived. *See Crossmann Communities, Inc. v. Dean,* 767 N.E.2d 1035, 1044 (Ind.Ct.App.2002) (issues raised for the first time in a reply brief are deemed waived).

**2.** The Evanses supplied this court with an appendix which was comprised of six volumes. The bulk of the appendix was a copy of the entire transcript. It is not necessary that a party include the entire transcript in the appendix. Rather, Indiana Appellate Rule 50(A)(2)(g) states that the appendix shall contain *brief* portions of the transcript which are important to a consideration of the issues upon appeal.

**3.** Evidence revealed that the "sidewalk" was actually one of a series of concrete bands which were used to hold in place the pavers which comprised the driveway. In addition, they also served an aesthetic purpose in dividing up the area leading up to the pavilion. Because their use as sidewalks is disputed, we will refer to them throughout this decision as "concrete band(s)."

Cole. After the presentation of a considerable amount of evidence, the jury determined that Lorean suffered total damages of $100,000. The jury determined that Lorean was 45% at fault for her fall. Further, the jury assigned 20% of the fault to Buffington Harbor and 35% to Valet Parking. The jury determined that Cole was 0% at fault. After applying the percentages of fault to the total amount of damages, the jury awarded Lorean $20,000 from Buffington Harbor and $35,000 from Valet Parking.[4]

# I

## *Juror Misconduct*

The Evanses assert that the jury considered extraneous prejudicial information and that such information tainted the verdict. They contend that the trial court should have granted the motion for a new trial which they filed after learning about certain statements made during deliberations. Through a sworn affidavit, the alternate juror brought the following information to light:

"4. The first thing decided by the jury was that Henry Evans would be awarded zero damages since he was not physically injured nor present at the time of Lorean Evans' fall. Since Henry had not sustained any direct physical injury himself, he could receive no verdict according to the jury foreperson.

5. During deliberations, one juror with nursing experience stated that Lorean's future knee surgeries would be paid for by Medicare or Medicaid and that therefore the verdict should not include any amount for those surgeries. Therefore, no amount was included in the verdict for these surgeries.

6. The jury foreperson stated that she would not agree to any large damage award for the Evans' [sic] based upon the fact that the Evans' [sic] attorney was seen getting out of a black Mercedes–Benz automobile before trial. She advised the jury that the Evans' [sic] attorney would receive a percentage of the Evans' [sic] recovery, that he did not need any more money, and that she would not agree to any substantial verdict for the Evans [sic] because of the fact that their attorney would receive a portion of it.

7. Several jurors indicated that since Lorean Evans had been issued a 'Player's Card' by the two casinos, that she must be a 'compulsive gambler' and that she would likely gamble away any verdict received so that rendering any substantial verdict in the Evans' [sic] favor would amount to a waste of time and money." Appendix at 1447.

Indiana has long adhered to the rule prohibiting jurors from later impeaching their verdicts based upon the fear that the use of juror affidavits may defeat the jury's solemn acts under oath, open the door to post-trial jury tampering, and allow dissatisfied jurors to destroy a verdict after assenting. *Griffin v. State*, 754 N.E.2d 899, 902 (Ind.2001), *aff'd on reh'g* 763 N.E.2d 450 (Ind.2002). Indiana Evidence Rule 606(b) states:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment concerning the juror's mental processes in connection therewith, ex-

---

4. The jury awarded Henry Evans "$0" damages against Buffington Harbor, Valet Park-

ing, and Cole, upon his loss of consortium claim.

cept that a juror may testify (1) to drug or alcohol use by any juror, (2) on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or (3) whether any outside influence was improperly brought to bear upon any juror. A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes."

*See also Robinson v. State*, 720 N.E.2d 1269, 1273 (Ind.Ct.App.1999).

■ We review a trial court's denial of a request for a new trial because of juror misconduct for an abuse of discretion, with the burden upon the appellant to show that the misconduct meets the prerequisites for a new trial. *Griffin*, 754 N.E.2d at 901.[5] When reviewing a denial of a request for a new trial, we do not consider a juror's comments about how an outside influence affected the decision. *Id.* at 902–03 (stating that the fact that one juror says that the alternate's input affect-

ed her decision is not part of the analysis governing the request for a new trial). Because Federal Rule of Evidence 606(b) is similar to Indiana's Evidence Rule 606(b), federal practice may inform our analysis. *Id.* at 902. In addition, the legal bar to the impeachment of a verdict is greatest where the interchange between the jurors, and not a communication by a nonjuror, creates the problem. *Ferguson v. State*, 489 N.E.2d 508, 510 (Ind.1986).

■ We begin by noting that the alternate juror's allegations in regard to the jury's discussion that Henry be awarded zero damages and that Lorean was a compulsive gambler do not meet one of the three exceptions to Rule 606(b).[6] While the Evanses have claimed that the allegations constituted extraneous prejudicial information, they were strictly comments by the jury upon the evidence presented, the inferences drawn from that evidence, and the jury's view of the law. Therefore, those two allegations of misconduct may not be considered as evidence of juror misconduct.[7] *See Robinson*, 720 N.E.2d at

---

**5.** In a recent opinion by a separate panel of this court, the burden which is placed upon an appellant when alleging juror misconduct was called into question. *See Hall v. State*, 796 N.E.2d 388, (Ind.Ct.App.2003) (stating that the party alleging juror misconduct should not bear the burden of proving that he was prejudiced by the misconduct but that the State should prove that the defendant was not prejudiced by the misconduct), *trans pending*. Whether the burden to show prejudice, or lack thereof, is properly upon the appellant or the appellee is irrelevant to our determination of whether improper extrinsic information was before the jury and whether that information may be used to impeach the jury's verdict.

**6.** The Evanses claim in their reply brief that because the affidavit was not objected to before the trial court that its contents may not be challenged upon appeal and that it must be accepted as true. Relying upon this court's decision in *Jewell v. State*, 624 N.E.2d 38, 42

(Ind.Ct.App.1993), the Evanses note that when the defendant in a criminal trial seeks to bring facts outside of the record to the court's attention, he must submit an affidavit. If the affidavit is uncontradicted, the court must accept its contents as true. *Id.* Even accepting the contents of the alternate juror's affidavit as true, we are not bound to conclude that the verdict may be impeached by its contents. The import of the *Jewell* decision is that we must accept the alternate juror's claims as true. Nonetheless, that does not remove the claim from the reach of Evidence Rule 606(b) and its general prohibition on impeachment of verdicts.

**7.** In a footnote in their brief, the Evanses state: "The jury's last conclusion—that Lorean must have been a 'compulsive gambler' only confirms the propriety of the Evans' [sic] objections to the admission of any evidence of her having a 'Player's Card' issued by either casino. The casinos were not parties to the trial and whether or how much she gambled

1273 (holding that the rules of evidence do not allow the appellate court to "step inside the 'head' of each jury member and to second-guess the complex manner in which the jury weighed the evidence and the law to reach its verdict").

Turning our attention to the two remaining allegations sworn to by the alternate juror, we conclude that the only exception under 606(b) in which they may fit is the category of extraneous prejudicial information improperly brought to the jury's attention. The allegations clearly do not reference drug or alcohol use by any juror, nor do they refer to an outside influence improperly brought upon a juror. *See Johnson v. State,* 700 N.E.2d 480, 481 (Ind. Ct.App.1998) (stating that exception (3) to 606(b) envisions *sources* outside of the jury). Further, to the extent that they may include an indication of the effect that the alleged misconduct had upon the jury, they cannot be considered. *See Griffin,* 754 N.E.2d at 902–03.

■ Moreover, we cannot agree that the alleged comment by the jury foreperson that she would not agree to a large award because the Evanses' counsel would receive a portion of it is encompassed within the type of information which a juror may testify to following a verdict. While the information may be considered "extraneous" and "prejudicial," it did not add to the facts specific to the case, nor did it consti-

tute an application of special knowledge to explain the facts. Rather, it was a juror's speculation upon how much an attorney would be paid for his services and indicated that the juror did not desire for the attorney to receive a substantial payment for his services. This relates to the individual juror's thought process during deliberation and not upon extraneous prejudicial information which is pertinent to the case.[8] *See Morgan v. Woessner,* 997 F.2d 1244, 1261–62 (9th Cir.1993) (holding that information about juror's speculation on amount of attorney fees would not support motion for a new trial), *cert. dismissed* 510 U.S. 1033, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994).

■ Finally, we cannot conclude that the alleged statement by a juror who informed the jury that Medicare or Medicaid would pay for future surgeries may be considered to impeach the verdict. While this statement is closer to the type of information which would be prohibited, it is not. The juror's statement is the type of knowledge gained from ordinary life experience, which may be properly brought to the jury room and relied upon. *Cf. Bibbins v. Dalsheim,* 21 F.3d 13, 17 (2nd Cir.1994) (juror's observation on life of community is part of the fund of ordinary life experience upon which jurors may rely), *cert. denied* 513 U.S. 901, 115 S.Ct. 261, 130 L.Ed.2d 181.[9] Additionally,

was not relevant to any issue the jury was called upon to decide. Therefore, the Court's erroneous admission of this evidence over objection is an additional bases [sic] for reversal." Appellant's Br. at 19 (citations omitted). To the extent that the Evanses may have sought a new trial based upon this ground, the lack of argument or citation to authority militates against our review of the issue. *See Romine v. Gagle,* 782 N.E.2d 369, 386 (Ind.Ct.App.2003), *trans. denied.*

8. That the jury foreperson's views toward the compensation payable to the attorney may

have been triggered by his exit from a Mercedes–Benz dos not alter our holding upon this issue.

9. It may be that by alleging that the juror who made the statement was a nurse, the Evanses were implying that the juror had gained some special knowledge about Medicare and Medicaid. While one who works in the medical profession may have more knowledge about Medicare and Medicaid than those who do not work in the medical profession, the availability of government provided medical coverage for certain groups of individuals, includ-

even if some of the alleged improprieties could properly be considered as the types of extraneous information which may be used to impeach a verdict, the Evanses have not been prejudiced by the extraneous information before the jury. This conclusion is made more evident in our discussion of the sufficiency of the damage award in the following section.

## II

### Amount of Damage Award

 A person injured by the negligence of another is entitled to reasonable compensation, which is such sum as would reasonably compensate the victim both for bodily injuries and pain and suffering. *Ritter v. Stanton*, 745 N.E.2d 828, 843 (Ind.Ct.App.2001), *trans. denied, cert. denied* 536 U.S. 904, 122 S.Ct. 2357, 153 L.Ed.2d 179 (2002). To that sum is added past, present, and future expenses reasonably necessary for the plaintiff's treatment and all financial losses suffered, or to be suffered, as a result of the inability to perform one's usual occupation. *Id.*

 Traditionally, we have afforded the jury considerable discretion in assessing damage awards. *Dee v. Becker*, 636 N.E.2d 176, 178 (Ind.Ct.App.1994). When an appellate court determines that the damages awarded are inadequate, a new trial on the issue of damages alone is proper only when it is clear that the jury verdict on liability is not the result of compromise. *Sherman v. Kluba*, 734 N.E.2d 701, 705 (Ind.Ct.App.2000), *trans. denied.*

The Evanses were awarded a total of $100,000 for Lorean's injuries. As previously stated, the jury returned a damage award of zero dollars for Henry. The

Evanses claim that undisputed evidence revealed that Lorean's actual medical expenses from past treatment and future surgeries total over $107,000. In addition, they also point to her lost wages and pain and suffering to indicate that a larger award was necessary to fully compensate Lorean. Further, they claim that the evidence established that Henry was entitled to damages because he missed work to take care of Lorean and that he had to perform all of the jobs that Lorean normally performed around the home.

Regarding Lorean's injuries, the evidence is not as favorable to Lorean's claim as she has asserted. While it is true that the defendants did not present evidence or witnesses to refute the testimony of Dr. Judson Wood, the orthopedic surgeon who treated Lorean's injuries, none was necessary. Rather, the jury could infer from the evidence presented that whether Lorean would require two knee replacement surgeries in the future was speculative.

Dr. Wood testified that in his professional opinion, Lorean would "need a future surgery on her knee." Transcript at 208. Dr. Wood also testified that a typical knee replacement surgery will last ten to fifteen years and that a subsequent surgery will need to be performed at that time. He further stated that based upon Lorean's age, "if she were to have [surgery] within the next five years," she would require a second surgery in the future. *Id.* at 211. While it was his opinion that she would likely require a surgery in the next five years, he agreed that she had not been scheduled for a total knee replacement. It was also established at trial that Lorean's life expectancy was an additional 20.2 years.

ing senior citizens, is widely known. Had the nurse used her specialized medical knowledge to provide additional facts, analysis, or specu-

lation regarding the extent of Lorean's injuries, the result of this analysis may have been different.

From this evidence, the jury may have reasonably concluded that Lorean would require only one knee replacement surgery. Assuming that Lorean has the first surgery at the end of the five year period, a second surgery may not be necessary until fifteen additional years have passed. If such were true, Lorean's second surgery would not be necessary until approximately twenty years from the date of the trial. This is roughly the time of her life expectancy. Further, Dr. Wood's testimony did not conclusively establish that Lorean would require a knee replacement in the next five years. He clearly stated that *if* she had a surgery in the next five years that she would need a second. Further, he acknowledged that it was *likely* that Lorean would require surgery within the next five years. Even though it is possible that a jury could conclude from this evidence that Lorean would need two knee replacement surgeries, it is also possible for the jury to have concluded that Lorean would need only one surgery. A jury determination that Lorean would need only one surgery was within the scope of the evidence and also helps to explain the award of damages.

The evidence established that Lorean had accumulated past medical expenses of $27,417.29. Dr. Wood's testimony fixed the price of a knee replacement surgery and rehabilitation at $40,000 to $60,000. Additionally, the evidence revealed that Lorean was a teacher. She stated that she was paid for a school year from September through August. Further, she was scheduled to teach the school year which began in the September following her injury. Her testimony also revealed that she earned $19,938.10 during a school year at Immaculate Conception High School. Early in 1999, Lorean attempted to go back to teaching but quit after eleven days because she could not climb the stairs at the school and felt that she could not give the students one hundred percent of her effort. However, Dr. Wood testified that he released Lorean to return to work as a substitute teacher on February 3, 1999. Additionally, the evidence established that she taught during the 1999–2000 school year. Moreover, Lorean testified that she was claiming lost wages only for her teaching job which began in September for the 1998–1999 school year. Assuming that the jury awarded Lorean lost wages for the entire 1998–1999 school year, and adding in the past medical expenses and potential future medical expenses for one surgery, the range of the damage award is $87,355.39 to $107,355.39. If the jury had accepted the low end of the range of damages as proper, it may have also included a sum for pain, suffering, and mental anguish. Because the damage award of $100,000 is within the bounds of the evidence, we cannot conclude that it was inadequate. Therefore, Lorean is not entitled to a new trial against Buffington Harbor or Valet Parking on her claim of inadequate damages.

A claim related to Lorean's is Henry's claim that the award of zero damages against Buffington Harbor and Valet Parking was inadequate. Henry's claim is based upon the loss of consortium arising out of Lorean's injury. A loss of consortium claim is described as a claim derivative of the injured spouse's personal injury claim. *Durham v. U–Haul Int'l.*, 745 N.E.2d 755, 764 (Ind.2001). Consortium had been defined to include both tangible and intangible elements. *Id.* at 765. In addition to the provision of material services, consortium includes both conjugal and other elements of companionship, such as service, aid, fellowship, companionship, company, cooperation, and comfort. *Id.* It also includes material services, i.e., calculable and monetary damages, as well as love, care, and affection. *Id.*

In the argument section of their brief, the Evanses assert that Henry's claim for loss of consortium was valid and that evidence that Henry had to fulfill Lorean's household duties supported the claim. During the trial, Henry testified that it was more difficult for him and his wife to go out like they used to. Further, Henry testified that he and Lorean could no longer plant a garden. Henry also acknowledged that he would do things formerly done by Lorean, such as making breakfast because she was too slow. Additionally, Henry testified that what he missed most about his wife was her energy. Henry also testified that he had to miss work to take Lorean to her appointments with her doctor. In order to make up the time that he missed, he would not charge his boss when he had to go places for work on the weekends and he did not get a bonus for attending the Automobile Parts Association Convention for work, which required him to be away on a Saturday and Sunday. Lorean and Henry's granddaughter, Tiffany, testified that family members would help Lorean with her daily activities, such as getting to the restroom, bathing, cleaning, and preparing her food.

In this case, the jury determined that based upon the above testimony, Henry was not damaged. This is clear from the verdict forms which were returned by the jury. It is quite possible that the jury determined that Henry suffered no damages because of a general disdain for loss of consortium claims. This seems to be the implication of the Evanses' brief. However, while that is possible, the evidence does support the jury's determination that Henry suffered no damages which would support a loss of consortium claim. While Henry testified that it was difficult for him and Lorean to go out, he agreed that they still could. Even though Henry stated that they no longer planted a garden, his testimony did not clearly indicate that they stopped planting the garden as a result of Lorean's injury. While the evidence was clear that Lorean was unable to take care of herself for a period of time and could no longer do things as quickly as she once could, the evidence did not establish that Henry performed the tasks that Lorean could not do other than Henry acknowledging that he would sometimes make breakfast. Instead, the evidence established that Henry did not miss work to take care of Lorean or do things around the home, only that he missed work to take her to the doctor. It is likely, given that their granddaughter testified about Lorean's inability to do house work and the granddaughter's statements that "we" took care of her, that family members other than Henry saw to Lorean's well-being while he continued to work.

 Finally, while there was evidence that Henry lost some time and money from having to transport Lorean to her doctor's appointments, no monetary value for lost wages was established. Further, our research has led us to conclude that the damages which Henry may have suffered through the missed work are not appropriately considered as loss of consortium. As previously stated, Indiana courts have included the loss of material services in calculations of damages for loss of consortium. As noted in *Troue v. Marker*, 253 Ind. 284, 291, 252 N.E.2d 800, 805 (1969), consortium includes "services and charges which one partner in the marriage performs for the other and have a monetary and pecuniary value." In *Troue*, that service was described as the husband driving his wife where she wanted to go. Once he was no longer able to drive her, the reasoning stood that she would have to hire transportation or use her own means of conveyance at her own expense. 253 Ind. at 291–92, 252 N.E.2d at 805. The claim here does not arise from a service

which Lorean could no longer perform for Henry, rather it was for something which Henry did for Lorean after her injury. As such, it is not compensable as loss of consortium.

While a different jury could have awarded Henry some damages for his loss of consortium claim, the evidence also could support a jury determination that Henry suffered no compensable damages. Because the zero damage award for loss of consortium is within the bounds of the evidence, we cannot say that the award is inadequate as a matter of law. Therefore, the Evanses' claim of inadequate damages does not support their request for a new trial.[10]

### III

### *Summary Judgment*

■ The final issue presented by the Evanses is whether the trial court erred in granting summary judgment in favor of HHN and Design Workshop. Following the trial court's ruling in favor of HHN and Design Workshop, the Evanses sought an appeal of the granting of summary judgment. During that same time, Cole sought to have the denial of its motion for summary judgment certified for interlocutory appeal by the trial court. After the Evanses' appeal was filed, they subsequently filed a motion requesting that this court dismiss their appeal without prejudice so that the trial could be completed before any appeal was taken by any party. It appears that an agreement was made at the trial court level that the Evanses

would dismiss the appeal if the trial court denied Cole's request for certification for an interlocutory appeal. In the motion filed before this court by the Evanses, the Evanses articulated their belief that the initial filing of the appeal would preserve any error in the granting of summary judgment and that they could seek a new appeal of that order after the trial if necessary. This court issued an order on February 26, 2002 in which the Evanses' motion was granted and the appeal was dismissed without prejudice and remanded to the Lake Superior Court so that the trial could be conducted. The day after this court granted the Evanses' motion to dismiss, HHN filed with this court a motion objecting to the dismissal and subsequently filed a motion requesting that this court reconsider its previous order dismissing the appeal. Additionally, HHN sought transfer to the Supreme Court, but transfer was denied.

Upon this appeal, Both HHN and Design Workshop allege that the Evanses have waived their claim of error in the granting of summary judgment in favor of HHN and Design Workshop. They assert that the rules do not allow for an appeal to be dismissed under the circumstances present in this case and then reinstated after a trial as to other parties. They base their argument upon Indiana Trial Rule 54(B).

Trial Rule 54(B) states that final judgment upon a claim may be entered as to one or more parties, but fewer than all

---

**10.** As noted earlier in this decision, the trial which was conducted included Buffington Harbor, Valet Parking, and Cole as defendants. The jury determined that Cole should bear no liability with respect to Lorean's injuries and returned a verdict indicating such finding. The only claims presented by the Evanses in their brief which bore any connection to Cole were those of juror misconduct and inadequate damages. Those claims have been resolved in the favor of Buffington Harbor, Valet Parking, and Cole. Cole has presented the issue in its brief that it was entitled to summary judgment. As hereinbefore noted, because Cole has won upon the merits of the issues presented by the Evanses, we will not address the claim that Cole was entitled to summary judgment.

parties, when the trial court determines that there is no just reason for delay. When final judgment is entered, an appeal may be taken from the ruling. According to HHN, the dismissal of the Evanses' appeal subverted the rights of HHN and Design Workshop and placed the desires of the Evanses above the rule of law and the rights of the other parties in the lawsuit.

When the Evanses sought the dismissal of the appeal from this court and remand to the trial court, they based their request upon their belief that remanding the case for trial as to the other parties would promote judicial economy. Their contention was based upon the benefits of the case not proceeding simultaneously in two courts and the possibility that no appeal would be necessary if the case was resolved through negotiations or the judgment entered by the court would not warrant an appeal.

It is not clear from the original motion filed by the Evanses or their briefs filed for this appeal upon what authority the Evanses relied in seeking dismissal of their first appeal with regard to the summary judgments. However, from our reading of the appellate rules, it appears that Indiana Appellate Rule 37 establishes the criteria under which a party may seek to have an appeal dismissed and the cause remanded. Appellate Rule 37 states that an appeal may be dismissed without prejudice and the case remanded to the trial court for further proceedings when such will promote judicial economy or is otherwise necessary for the administration of justice. Whether the remand for trial as to some but not all of the defendants could actually achieve the goal of promoting judicial economy or was otherwise necessary for the administration of justice now seems doubtful. Nonetheless, this court granted the Evanses' request and dismissed the appeal without prejudice so that the trial could proceed as to the remaining parties.

We are now faced with quite a conundrum. While hindsight indicates that the Evanses' motion most likely should have been denied, we cannot conclude that the Evanses have waived their ability to appeal the trial court's order. On one hand, it clearly seems that the grant of the motion for dismissal placed the Evanses in a superior position over HHN and Design Workshop and negated finality of the ruling in favor of HHN and Design Workshop. Additionally, it does not appear that any benefit was gained by dismissing the appeal while the trial was conducted as to the remaining parties. Nonetheless, it was an order of this court which resulted in the Evanses' appeal being dismissed. Further, the order did exactly as the Evanses requested, it dismissed the appeal *without prejudice*.

HHN makes much of the fact that in the Supreme Court's order denying transfer the Supreme Court stated "that the denial of transfer does not reflect a decision on whether appellants have retained their appeal rights with respect to the appellee's summary judgment." Addendum to HHN's Brief, tab 5. According to HHN, we should interpret that statement to mean that the right of the Evanses to raise that same issue in this appeal has not been conclusively decided and is not the "law of the case." HHN's Brief at 15. Assuming that the Evanses' right to appeal was not conclusively decided by the prior motion, we still must conclude that the Evanses may challenge the granting of summary judgment in favor of HHN and Design Workshop. We recognize that the Supreme Court's order may have cast some doubt upon the propriety of allowing the summary judgment appeal to be revived, but the Supreme Court's order does not prevent the appeal. *See* Ind. Appellate

Rule 58(B) (the denial of a petition to transfer shall have no legal effect other than to terminate the litigation between the parties in the Supreme Court). Therefore, we address the merits of the Evanses' claim.

Summary judgment is appropriate when the designated evidentiary matter reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Hammock v. Red Gold, Inc.*, 784 N.E.2d 495, 498 (Ind.Ct.App.2003), *trans. denied.* The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that there is an entitlement to judgment as a matter of law. *Id.* If the moving party meets these requirements, the burden then shifts to the nonmovant to establish genuine issues of material fact for trial. *Id.*

In reviewing the grant or denial of a motion for summary judgment, we are bound by the same standard as the trial court. *Id.* We consider only those facts which were designated to the trial court at the summary judgment stage. *Id.* We do not reweigh the evidence, but rather, liberally construe all designated evidentiary material in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact. *Id.* Even if the facts are undisputed, summary judgment is inappropriate where the record reveals an incorrect application of the law to the facts. *Id.* Summary judgment is rarely appropriate in negligence cases because issues of contributory negli-

gence, causation, and reasonable care are more appropriately left for determination by the trier of fact. *Id.*

To recover under a theory of negligence, a party must establish: (1) a duty on the part of the defendant owed to the plaintiff, (2) a breach of that duty, and (3) an injury to the plaintiff proximately caused by the breach. *Id.* Generally, the existence of a legal duty owed by one party to another is a pure question of law. *P.T. Barnum's Nightclub v. Duhamell*, 766 N.E.2d 729, 737 (Ind.Ct.App.2002), *trans. denied.* However, factual questions may be interwoven, rendering the existence of a duty a mixed question of law and fact to be determined by the fact-finder. *Baxter v. I.S.T.A. Ins. Trust*, 749 N.E.2d 47, 55 (Ind. Ct.App.2001).

Summary judgment was granted for HHN and Design Workshop based upon the fact that the parking lot was created months after they had completed their work and that their work had been accepted by Buffington Harbor. It is true that Indiana has generally followed the rule that contractors do not owe a duty of care to third parties after the owner has accepted their work. *See Blake v. Calumet Constr. Corp.*, 674 N.E.2d 167, 170 (Ind.1996).[11] The Evanses contend that the trial court erred in failing to consider an exception to the acceptance rule—that the condition of the premises was inherently dangerous because of the work performed by HHN and Design Workshop. When the work is deemed dangerously defective, inherently dangerous, or immi-

11. In a footnote in their brief, the Evanses note that the acceptance doctrine has come under increasing criticism in Indiana and should be abandoned. The Evanses cite to *Peters v. Forster*, 770 N.E.2d 414 (Ind.Ct.App. 2002), as support for their assertion. However, they note that transfer was granted in *Peters* by our Supreme Court and do not make the claim that we should review the acceptance doctrine in this case. Given that our Supreme Court has continued to apply the acceptance doctrine, and as of this date, has not abandoned that doctrine in favor of the foreseeability rule used in the majority of states, we will not address the issue further.

nently dangerous such that it poses a risk of imminent personal injury to third parties, a contractor may owe a duty to a third party. *Id.* The determination of whether a duty exists turns upon the factual issues of whether the owner accepted the work and, if so, whether the condition of the work presented a risk of imminent personal injury as of that time. *Id.*

HHN was hired by Buffington Harbor to serve as the construction manager for the project. As construction manager, its duties were to schedule and coordinate subcontractors at the site, receive construction documents, review bills from the subcontractors, and inspect the completed projects to confirm that they complied with the contract drawings. At no time did HHN's work involve evaluating the safety or technical feasibility of any of the designs.

Design Workshop was hired by Buffington Harbor to provide the landscaping in the construction area. Design Workshop was responsible for designing the layout for things such as the trees, shrubs, grassy areas, and the driveway. However, Design Workshop did not perform the actual work on the landscaping, they only provided the plans upon which other contractors relied.

At the time that HHN and Design Workshop completed their work for Buffington Harbor, the parking lot wherein Lorean was injured was nothing more than a grassy area surrounded by bushes. It was not until several months after they had both finished their respective jobs at the worksite that Buffington Harbor had the grassy area transformed into a parking lot. Neither HHN nor Design Workshop took part in the construction or design of the parking lot. Consequently, the trial court's decision to grant summary judgment to both HHN and Design Workshop would seem to be defensible upon the ground that they could not be responsible for someone's injuries which occurred when entering the parking lot. Nonetheless, the view that liability would arise only if the defendants took part in the construction of the driveway is based upon too narrow of a reading of the law and the evidence. Liability may arise if HHN or Design Workshop left the property in a dangerous condition when they finished their work.[12] Therefore, we must determine whether evidence presented at the summary judgment hearing indicated that either or both HHN and Design Workshop left the premises in an inherently dangerous condition.

Relying upon the designated evidence, we conclude that HHN was properly granted summary judgment. No genuine issues of material fact exist which indicate that HHN's performance of its job left the premises in such a condition that there was an imminent risk that a third person would be injured. Indeed, the evidence established that HHN only verified that the contractors hired by Buffington Harbor completed their work as required. HHN did not perform design work, nor did it perform any construction tasks.

■ The facts are different for Design Workshop. In reaching our decision, we are guided by our Supreme Court's deci-

12. Waiver aside, with respect to dismissal by Evanses of the appeal from the summary judgments, the dissent as to Design Workshop focuses upon whether Design Workshop had finished its work on the project and the work had been accepted. With respect to the crucial issue of whether there was a material issue of fact as to leaving the premises in a dangerous condition, the dissent reflects a lack of consideration that the drop-off, even prior to the construction of the parking lot, could be reasonably considered to be a dangerous condition.

sion in *Blake, supra*. In *Blake*, a construction worker was injured when he fell approximately four feet to the floor of a loading dock. The fall occurred at 9:00 p.m. and the area around the loading dock was unlit. The plans for the loading dock required that guardrails be placed around the loading dock; yet, none were. Our Supreme Court held that conflicting facts existed as to whether the owner had accepted the work of the contractor who constructed the loading dock. *Blake*, 674 N.E.2d at 171–72. Our Supreme Court also determined that if the jury concluded that the work was accepted, the contractor may have still owed the injured claimant a duty because the work was imminently dangerous. *Id.* at 173. It was noted that a plaintiff must do more than simply plead that the work was dangerously defective, inherently dangerous, or imminently dangerous to avoid summary judgment. *Id.* Instead, the claimant must present some evidence tending to show that the work or instrumentality presented an imminent risk of personal injury to third parties. *Id.* The Supreme Court determined that the lack of a safety device on a darkened construction site was enough to present a jury question in regard to whether the loading dock was imminently dangerous. *Id.*

Here, the evidence clearly establishes that Design Workshop drafted the plans for the landscaping, which included the concrete bands. The designated evidence, which includes pictures of the concrete bands, reveals what appear to be sidewalks that end in a drop-off of approximately 30 inches over a retaining wall. Design Workshop asserts that the situation was not inherently dangerous because there was no reason for anyone to walk to the grassy area. In fact, they cite to deposition testimony from two different individuals which lend credence to their argument that no one used the grassy area or walked to it. In their view, if no one walked across the concrete bands until the grassy area was changed to a parking lot, they could not be liable because a duty could not exist due to an imminently dangerous condition.

However, just as in *Blake*, evidence existed from which a reasonable jury could conclude that the condition of the concrete band with the drop-off was reasonably certain to place life or limb in peril. Because the evidence is undisputed that Design Workshop incorporated the use of the concrete bands into the design, liability may lie with regard to the bands.[13] In remanding this case to the trial court to conduct further proceedings upon the issue of liability on the part of Design Workshop, the following procedure may be advisable:

The issue of whether the premises were left in an imminently dangerous condition as a result of Design Workshop's responsibilities in relation to the construction should be the sole issue which is presented to the jury. If the jury finds that Design Workshop did not leave the premises in an imminently dangerous condition, no further proceedings are warranted. If the jury finds that Design Workshop left the premises in an imminently dangerous condition,

13. Design Workshop contends that no new trial is warranted because the jury found that Cole bore no liability toward Lorean for her injuries. It notes that Cole was denied summary judgment because of the fact that there was a genuine issue of material act as to whether Cole was employed by Buffington Harbor at the time in which Lorean was injured. According to Design Workshop's logic, if Cole was not liable, neither could it be. Such is not the case. The evidence indicates that Design Workshop was responsible for the design and presence of the concrete bands. No such evidence existed as to Cole.

then evidence of fault and damages could be presented.[14]

### Conclusion

We wish to make clear that this remand for further proceedings does not affect the position of any appellee other than Design Workshop. Summary judgment was properly granted for HHN as no genuine issue of material fact existed which indicated that HHN was in any way responsible for the concrete bands or the retaining wall along the grassy area/parking lot. Further, the verdicts returned by the jury could not be impeached through the use of the affidavit of the alternate juror; consequently, no grounds for awarding a new trial existed. Finally, the jury award of damages of $100,000 to Lorean, and for zero dollars to Henry, was not inadequate so that the Evanses are entitled to a new trial.

The judgment of the trial court is affirmed in part and reversed in part. We remand for further proceedings not inconsistent with this opinion.

RILEY, J., concurs.

FRIEDLANDER, J., concurs in part and dissents in part with separate opinion.

FRIEDLANDER, Judge, concurring in part and dissenting in part.

I agree with the majority in all respects except the reversal of summary judgment in favor of Design Workshop. I believe Design Workshop was entitled to summary judgment on the merits. Moreover, I believe the Evanses waived any argument challenging the trial court's ruling in that regard when the original appeal of that ruling was dismissed at their request. Therefore, I respectfully dissent both from the decision to address the merits of that judgment, and also to reverse it on the merits.

Design Workshop was hired to design the landscaping around the two casinos. Its plans called for a driveway constructed of large beds of concrete pavers. Design Workshop produced a design that utilized a number of concrete bands to contain and hold the pavers in place. As originally designed, approximately four of those bands extended from the casinos to a "green planting area" (green area). *Brief of Appellee Design Workshop, Inc.* at 3. It was one of these four bands that was involved in Lorean Evans's fall. The green area was entirely decorative as originally conceived. There were no benches, tables, or anything else located therein that would have attracted casino patrons to the area. In fact, a casino employee submitted an affidavit stating that she had *never* seen anyone walk into or around the green area. During the construction phase of the project,[15] Design Workshop representatives occasionally visited and monitored the progress of construction. The last visit to the site by Design Workshop personnel occurred on May 15, 1997. The project was completed no later than July 31, 1997, which is the day that Design Workshop sent its final invoice for payment. That final payment was made on September 22, 1997.

Sometime after Design Workshop's work on the project was completed, but

---

14. We recognize that the procedural posture of this case upon remand contains a number of hidden concerns as to the matter of issue preclusion under the doctrine of res judicata as to one or more defendants/appellees who were parties to judgments after the original trial.

15. I note here that Design Workshop's duties on the project consisted only of designing the landscaping. Design Workshop was not involved in constructing or implementing its design.

before Evans fell, the casinos decided to dig up the green area and construct a parking lot in its place. That project, in which Design Workshop played no part, was completed no later than July 7, 1998. The incident that resulted in Lorean Evans's injury occurred three weeks later, on July 28, 1998. Therefore, the incident occurred well in excess of one year after Design Workshop's work on the project ended, and approximately ten months after Design Workshop received final payment for its services.

As a matter of law, how long does a contractor's liability extend after the work has been completed and the owner resumes control of the premises? Our supreme court addressed precisely that question, as the following excerpt reflects:

> Contractors are liable for negligence while their work is in progress because they are presumably in a better position than the landowner to prevent injuries to third parties. However, because a contractor's presence is transient the law has sought to relieve the contractor of liability after the work is accepted and completed, subject to some exceptions. *Daugherty v. Herzog*, 145 Ind. 255, 44 N.E. 457 (1896) is the seminal Indiana case holding that a contractor's duty of care to third parties is extinguished upon acceptance of the work. In *Daugherty*, the contractor remodeled the front wall of a drug store. Two years after the work was completed and turned over to the owner, the wall collapsed and killed the plaintiff's daughter, who had been walking on the public sidewalk below. In affirming the trial court's grant of a demurrer, we reasoned that "[t]here must be some causal connection between the negligence and the hurt; and such causal connection is interrupted by the interposition, between the negligence and the hurt of any independent human agency."

*Daugherty*, 145 Ind. at 257, 44 N.E. at 457 (internal quotation marks omitted). Thus, we emphasized in *Daugherty* that a contractor's duty of care ceases once the owner is again better able than the contractor to prevent harm to third parties.

*Blake v. Calumet Const. Corp.*, 674 N.E.2d 167, 170–71 (Ind.1996). The court took the occasion of *Blake* not to abrogate the long-held rule that a contractor's liability terminates at acceptance, but to expand on it. Specifically, the court provided guidance on determining whether "acceptance" as used in this context has occurred. The court set out the following four-step inquiry:

> "(1) the owner or its agent reasserted physical control over the premises or instrumentality; (2) the work was actually completed; (3) the owner expressly communicated an acceptance or release of liability; or (4) the owner's actions permit a reasonable inference that the work was accepted. The owner can indicate an acceptance by re-occupying, leasing, selling or otherwise using the premises in a manner inconsistent with further physical control or construction activity by the contractor."

*Id.* at 171.

The evidence of record reveals that Design Workshop completed its duties for Buffington Harbor Riverboats, L.L.C. no later than July 31, 1997 and was paid in full for its completed work in September of 1997. "Physical control over the premises" was surely reasserted by Buffington when Design Workshop's duties were completed and it was paid the balance of the fees owed for its services. This reassertion of control is evidenced by, among other things, the fact that Buffington modified Design Workshop's work by replacing the green area with a parking lot—a deci-

sion that was made and implemented without consulting Design Workshop. Moreover, the facts that Buffington (1) paid the final bill for Design Workshop's services without registering a complaint, (2) did not consult Design Workshop again, and (3) conducted business as usual at the casinos after Design Workshop's work was concluded leads not merely to a reasonable inference that Buffington accepted Design Workshop's work, but indeed leads inexorably to *only* that conclusion. Therefore, in my view, the trial court did not err in granting summary judgment in favor of Design Workshop.[16]

Even assuming for the sake of argument that there remains a question of fact on whether Buffington "accepted" Design Workshop's work, I believe the Evanses waived their challenge to the granting of Design Workshop's summary judgment motion when they petitioned this court to dismiss their original appeal of that ruling. Trial Rule 54 is based on the federal model, and was adopted in an effort to provide greater certainty to litigating parties, and to strike an appropriate balance between the interest in allowing for speedy review of certain judgments, and the interest in avoiding piecemeal litigation. *Martin v. Amoco Oil Co.,* 696 N.E.2d 383 (Ind.1998), *cert. denied,* 525 U.S. 1049, 119 S.Ct. 608, 142 L.Ed.2d 548. Subsection (B) of that rule provides, in pertinent part, as follows: "A judgment as to one or more but fewer than all of the claims or parties is final when the court in writing expressly determines that there is no just reason for delay, and in writing expressly directs entry of judgment, and an appeal may be taken upon this or other issues resolved by the judgment[.]"

No one disputes that the Evanses *could* have appealed the grant of summary judgment in favor of Design Workshop at the time the judgment was entered. Indeed, the Evanses did just that. They asked this court to dismiss that appeal, however, in a motion filed pursuant to Trial Rule 37. It appears that decision was tactical in nature, and was at least partially related to Cole's request to certify the denial of its summary judgment motion for interlocutory appeal. The majority concludes that revival of the appeal is appropriate in part because "it was an order of this court which resulted in the Evanses' appeal being dismissed." *Op.* at 1115–1116. The majority further notes that the appeal was dismissed without prejudice. Although these statements are factually correct, they do not lead inevitably to the conclusion that it seems to me the majority draws from them, i.e., that we must permit revival of the appeal out of a sense of fair play.

I agree with the majority that, in hindsight, we should not have granted the T.R. 37 motion to dismiss. The fact that we granted their request, and did so without prejudice, did not thereby confer on the Evanses what amounts to immunity from the operation of the rules of trial and appellate procedure. It seems to me that this case provides a clear example of why we should not permit litigants to "shelve" the appeal of a dismissal of one party while the matter proceeds to trial with respect to remaining parties. Following a trial, a

---

16. Although I would grant summary judgment based upon the conclusion that Buffington accepted Design Workshop's work, I believe Design Workshop is also entitled to summary judgment on the merits of the Evanses' claim. The allegedly dangerous condition that led to Lorean Evans's injury was the alleged, precipitous drop between the concrete band and the parking lot. It seems obvious to me that there can exist no question of fact as to whether Design Workshop was liable for any danger inherent in that condition when the parking lot was not even *contemplated,* much less constructed, at the time Design Workshop completed its work on the project.

jury determined the amount of damages suffered by the Evanses and also apportioned fault among all of the parties then present in the lawsuit. We cannot surgically reinsert another party, i.e., Design Workshop, back into the proceedings at this point without running a serious risk of having to start all over again, at least from the time when the summary judgment motion was submitted. In my view, this is unacceptable from the standpoint of judicial economy. I believe the Evanses waived any error in the granting of Design Workshop's motion to dismiss when the first appeal of that ruling was dismissed at their request.